OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN
2016 OK 109
Case Number: SCBD-6333
Decided: 10/25/2016
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2016 OK 109, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,
v.
LARRY DOUGLAS FRIESEN, Respondent.

ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE

¶0 The Oklahoma Bar Association filed a complaint against Larry Douglas Friesen alleging multiple violations of the Oklahoma Rules of Professional Conduct, 5 O.S. 2011, ch. 1, app. 3-A, and the Rules Governing Disciplinary Proceedings, 5 O.S. 2011, ch. 1, app. 1-A. A panel of the Professional Responsibility Tribunal determined Respondent violated the Oklahoma Rules of Professional Conduct and the Rules Governing Disciplinary Proceedings, recommended he be suspended from the practice of law for one year and be assessed costs of the investigative and disciplinary proceedings. Upon our de novo review, we find Respondent's professional misconduct is established by clear and convincing evidence and order he be disbarred from the practice of law, his name be stricken from the roll of attorneys, he comply with Rule 9, RGDP, and he pay costs.

RESPONDENT DISBARRED; ORDERED TO PAY COSTS.

Gina L. Hendryx, General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.
Mack K. Martin and Amber B. Martin, Oklahoma City, Oklahoma, for Respondent.

COMBS, V.C.J.:

¶1 On November 13, 2015, the Complainant, Oklahoma Bar Association (OBA), commenced these proceedings pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, ch. 1, app. 1-A, and charged the Respondent, Larry Douglas Friesen (Friesen), with one count of misconduct. In Count I, the OBA alleged Friesen failed to represent his clients, Alma and Oscar Nevarez, with competence and diligence, failed to keep them informed about the representation and failed to promptly comply with reasonable requests for information. In addition, the OBA alleged he failed to safe keep his clients' funds from his own funds and he charged an unreasonable fee. These actions, the OBA asserted, constituted violations of Rules 1.1, 1.3, 1.4, 1.5, and 1.15 of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S. 2011, ch. 1, app. 3-A and Rule 1.3 RGDP.

I. FACTS AND PROCEDURAL HISTORY

¶2 The Trial Panel held a hearing and heard evidence on May 4, 2016. On June 13, 2016, the Trial Panel submitted a written report which found there was clear and convincing evidence Friesen violated Rules 1.1, 1.3, 1.4, 1.5, and 1.15 ORPC and Rule 1.3 RGDP, and recommended a one-year suspension of Friesen's license to practice law. At the hearing, the OBA presented evidence to support the following set of facts.

¶3 On June 21, 2009, Alma Nevarez and her husband Oscar Nevarez hired Friesen to represent them in a wrongful death action and executed an attorney-client agreement. Their 11-year-old daughter had died in an automobile accident earlier that month. The Nevarezes live in Goodwell, Oklahoma. She is a cafeteria worker for a local school and Oscar is a truck driver. The Nevarezes had little experience with attorneys and Friesen was recommended to them. On February 18, 2010, the wrongful death case was settled at mediation for $675,000.00. Alma speaks both Spanish and English. Oscar speaks Spanish and is not fluent in English nor can he read English; Alma must translate for him. At mediation, Friesen obtained a translator for Oscar Nevarez. This was done because Alma indicated she could not translate everything well. The Nevarezes were also presented a settlement proposal that included a structured settlement offer for the benefit of their three surviving children. It included examples of how a college fund/annuity (hereinafter college account) could be set up for each of their children and also included a brochure on structured settlements. Nothing was done with the structured settlement at mediation. On March 15, 2010, the settlement check for $675,000.00 was deposited into another attorney's trust account.[1] After attorney fees ($209,500.00) and reimbursement of litigation costs ($3,062.00), the Nevarezes recovered $462,438.00.

¶4 On May 23, 2010, the Nevarezes met with Friesen in Woodward to discuss what to do with the settlement proceeds. The testimony reflects they discussed opening various bank accounts with $350,000.00 of the settlement proceeds and discussed creating college accounts for the three children similar to what was presented to the Nevarezes at mediation. The testimony differed as to how this would be done. Alma Nevarez testified she thought the remaining $97,438.00[2] would be used to create the college accounts and pay for any costs. Her intention was to have approximately $30,000.00 of the $97,438.00 placed in an account for each child and the remainder would be used to provide an offset so that each child would receive the same amount of money due to their differing ages. She believed any leftover money would be used to pay applicable costs to establish these college accounts. Friesen testified the Nevarezes wanted to use the $97,438.00 as an attorney fee to pay Friesen to create five wills, four trusts, three annuities and to protect their $350,000.00 if the need should arise.[3] He testified one trust was to be a family trust made for Alma and Oscar Nevarez and one trust was to be made for each child when they turned eighteen years of age. The three college accounts were to be created to allow the three children to go to college. He believed any college accounts were to be established from a portion of $300,000.00 in the bank accounts. In addition, Alma testified once the various bank accounts had been established she wanted Friesen to receive the bank statements and mail them to her in a different envelope. She was concerned people in her community would find out about the settlement proceeds.

¶5 On September 20, 2010, the Nevarezes met with Friesen in Oklahoma City. They went with Friesen to three separate banks and opened three bank accounts for the purpose of depositing $350,000.00 of the settlement proceeds. They deposited $150,000.00 in two separate bank accounts, one under Alma's name and the other under Oscar's name, and $50,000.00 into another account under both of their names. The record reflects Friesen's legal assistant kept meticulous time records which showed that for the most part they complied with Alma's wishes concerning the mailing of bank statements. Friesen also had the Nevarezes sign a new attorney-client agreement (second attorney-client agreement). This agreement states in pertinent part:

Legal Fees

Prior to this date, you have received checks of $12,000.00 on May 27, 2010 and $3,000.00 on July 28, 2010. Today we are going to be placing $350,000.00 into various financial institutions on your behalf for a total distribution for you of $365,000.00. It is your wish by your signatures on this contract to pay the Law Offices of Doug Friesen the remainder of your settlement, $97,438.00, as a flat fee.

The purpose for this additional attorney-client agreement is to keep the Law Offices of Doug Friesen continuously hired to help us (Oscar and Alma Nevarez) keep the money protected from the people associated with us until after the youngest child has turned 18. Until that time we are desirous of a trust being created to protect our assets and when the youngest child turns 18 we wish to create a trust for each of the children. Additionally, we may want an annuity created for the children for college purposes, but we do not want it to be with the insurance company with whom the settlement was made. We understand that there is a provisions in the settlement which says we have to use that specific company, but have been advised by Doug Friesen that since they did not get us the money by the required time, we are not bound by this provision and we do not trust the insurance company because they took so long to pay us after the settlement agreement. The amount of this contract is to prepay Doug Friesen for all of these services to be provided.

The second attorney-client agreement also contained a non-refundable clause. It states the Nevarezes "have the right to discharge me as your attorney" but if that should occur "the initial retainer will not be refunded." Alma confirmed that she and Oscar signed the second attorney-client agreement. The agreement was in English and Friesen did not hire an interpreter for Oscar. Alma testified Friesen would tell her what was in the agreement and she would translate the information to Oscar. She also testified that she did not recall reading the agreement when she signed it nor did she receive a copy of it. Alma only remembered that she had to sign some documents so that Friesen could set up the college accounts for her children. She believed the $97,438.00 would be used to set up these accounts, not that they would be used to pay Friesen a second legal fee.

¶6 On May 12, 2011, Alma Nevarez began calling Friesen's office inquiring about the children's college accounts. Alma testified she was mainly concerned with these accounts for her children and when she would call she would be told either they were sending her information, or the accounts were set up or there was a problem; she never could get any meaningful information about these college accounts.[4] After a long period of receiving no information, Oscar became agitated and accused Alma of taking the $97,438.00.[5] Alma testified Oscar had even left the house because he thought she had somehow taken the money. Sharon Orth, OBA Investigator, reviewed Friesen's law office time records and found approximately ten entries showing Alma was calling about the children's college accounts.[6] She notes these calls were made over several years. The investigator also noted Friesen's time records during this period did not indicate he created any wills or trusts or set up any college accounts for the children. The only work he performed for the Nevarezes was reviewing their bank statements each month and mailing those statements to them. At the hearing, Friesen confirmed he did not perform any estate planning nor did he set up any college accounts for the Nevarezes. An October 3, 2013, law office time record indicates Friesen was going to forward information to Alma from an insurance company as soon as he received it. Complainant's Exhibit 12 contains a Spanish version of the brochure presented to the Nevarezes at mediation over three years earlier and includes an envelope stamped December 11, 2013. Alma testified all she received from Friesen were bank statements and this brochure. Friesen testified he had sent other annuity proposals to her but could not find the information in his files nor is there any indication in the time records they were sent.

¶7 In December 2013, Alma contacted an attorney in Guymon, Oklahoma, Cory Hicks, to help her locate the missing $97,438.00. Hicks contacted the settlement company who explained although they had information on the Nevarezes' three children no funds had been deposited into any accounts. Hicks associated with another attorney Jim Dowell. On January 31, 2014, Dowell faxed Friesen a demand letter to provide an immediate accounting of the settlement funds and to return any funds to which he was not entitled. He sent a second request to Friesen on February 3, 2014. Friesen responded on February 6, 2014, and said "there are no missing funds in this matter." Friesen's response mentioned the second attorney-client agreement but did not specify any details on his fees. On February 12, 2014, Dowell filed suit on behalf of the Nevarez seeking a return of the $97,438.00. Through discovery, Friesen's attorney provided Dowell with a copy of the second attorney-client agreement and the Nevarezes' file. He assured Dowell that the entire file had been provided. The civil suit was settled four months later in June 2014. The Nevarezes were paid the entire $97,438.00 and attorney fees in the amount of $65,000.00. On September 15, 2014, Dowell submitted a grievance to the OBA which instigated these proceedings.

II. STANDARD OF REVIEW

¶8 This Court is vested with exclusive and original jurisdiction over attorney disciplinary proceedings. State ex rel. Okla. Bar Ass'n v. Cooley, 2013 OK 42, ¶4, 304 P.3d 453; State ex rel. Okla. Bar Ass'n v. Hart, 2014 OK 96, ¶6, 339 P.3d 895. We exercise the responsibility to decide whether attorney misconduct has occurred and what discipline is appropriate, not for the purpose of punishing the attorney, but to assess his or her continued fitness to practice law and to safeguard the interests of the public, the courts, and the legal profession. State ex rel. Okla. Bar Ass'n v. Wilburn, 2006 OK 50, ¶3, 142 P.3d 420. One of the purposes behind exercising discipline is to provide deterrence to the offending lawyer and other members of the bar. State ex rel. Okla. Bar Ass'n v. Livshee, 1994 OK 12, ¶12, 870 P.2d 770.

III. ANALYSIS

A. RULE 1.15 ORPC VIOLATIONS

¶9 The OBA alleges Friesen violated Rule 1.15 ORPC. The testimony and stipulations reveal the $97,438.00 was transferred to Friesen's operating account as soon as the second attorney-client agreement was signed, September 20, 2010. Friesen knew some of the work to be performed for the Nevarezes would not even be started for approximately fifteen years due to the ages of the children yet he immediately treated all the money as earned. Friesen testified he was confused as to when a flat fee is considered earned. Rule 1.15 ORPC requires a lawyer to safeguard property of clients and to deposit fees and expenses that have been paid in advance into the lawyer's trust account only to be withdrawn as such fees and expenses are earned. [7] That did not occur here.

¶10 Rule 1.15 ORPC also requires a lawyer to promptly deliver to the client any funds the client is entitled, promptly render a full accounting upon request and to hold separately any funds that are in dispute.[8] Friesen's response brief alleges he only became aware the Nevarezes were challenging his legal fee when they filed their lawsuit to recover the missing settlement proceeds on February 12, 2014. We find this incredulous. We agree with the OBA's assertion that it should have been clear to Friesen from Alma's multiple inquiries that there was a dispute concerning their respective interests in the $97,438.00 long before the lawsuit was filed. Alma made multiple inquiries requesting information about her children's accounts. At the very least Friesen should have known the $97,438.00 was in dispute on July 9, 2013. His time records for that day state, "[p]hone call from Ms. Nevarez; her husband is very upset; it has been four years and they still do not know where the money is and it is gathering interest." The evidence clearly shows the Nevarezes were not concerned about the $350,000.00. They knew where that money was held because they opened the accounts with Friesen. In addition, there should have been no doubt what amount was in dispute when Dowell sent Friesen a facsimile/letter on January 31, 2014. It provided, "you were to disburse $462,438.00 to Mr. and Mrs. Nevarez. According to Ms. Nevarez, you distributed only approximately $360,000 of the required $462,438.00 to them." This letter effectively terminated Friesen's representation of the Nevarezes, requested a full accounting of the settlement proceeds and requested a return of funds to which he was not entitled. Friesen's response to this letter never mentioned the $97,438.00 was a flat attorney fee nor did he offer to provide an accounting or return any unearned fees; he merely stated there are no missing funds. It was not until June 2014, almost four months after the initial demand letter, that Friesen settled the lawsuit and returned the $97,438.00. We find the OBA has proven by clear and convincing evidence that Friesen violated Rule 1.15 ORPC.

B. RULES 1.3 AND 1.4 ORPC VIOLATIONS

¶11 Rule 1.3 ORPC requires a lawyer to "act with reasonable diligence and promptness in representing a client." Rule 1.4 (a) ORPC provides a lawyer shall "(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished"; shall "(3) keep the client reasonably informed about the status of the matter"; and "(4) promptly comply with the reasonable requests for information." In addition, Rule 1.4 (b) ORPC provides a lawyer shall "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

¶12 The record reflects Alma Nevarez repeatedly over the span of two and one-half years requested information concerning the college accounts for her children which Friesen was supposed to facilitate. It is clear she was not requesting information about the bank accounts because she knew they existed and where they were located. It also appears from the record she was given misleading information. The time record of Terri Dennis, Friesen's legal assistant, for April 29, 2013, states "[p]hone call from client; the accounts are set up but we do not get monthly statements; will send her copies of where the accounts are and how much is in them." The reference to "accounts" in this time record would not be referring to the bank accounts because Friesen received regular bank statements for those accounts.

¶13 Friesen claims it was not his fault for not setting-up the college accounts. He claimed he was waiting on information from the Nevarezes. He also testified at the hearing that it was his belief the college accounts were to be created using a portion of $300,000.00 in the bank accounts. Friesen provided two letters in his defense, Respondent's Exhibits B and C dated September 23, 2010, and November 9, 2011, respectively, showing he requested information from his clients and was waiting on their answers. The authenticity of these two exhibits was called into question at the hearing. It was noted neither of these exhibits were presented to Dowell in his discovery requests during the Nevarezes' lawsuit against Friesen even though Friesen's attorney represented to Dowell that he had received the Nevarezes' complete file. In fact the first time these letters appeared was at the May 4, 2016, hearing before the Trial Panel. Friesen explained that when he received the bar complaint he took it very seriously and searched in his basement for anything that might have been misfiled. He said he found the two letters and the originals were in a bad condition therefore he presented copies of the letters. He also said he did not have these letters stored on his computer due to several computer failures and a virus. The OBA noted both letters, although written a year apart, misspelled Alma's name the same way (Alva). A review of the record reflects other features in these two letters different from contemporaneous letters, e.g., the salutation is written "Dear Oscar and Alva" whereas other correspondence introduced referred to the Nevarezes as Mr. or Mrs. At the hearing, Alma Nevarez said she does not recall seeing either letter. The OBA also noted there were no time records reflecting any work on these two letters.

¶14 Regardless of the authenticity of Exhibits B and C, it is obvious from Alma's multiple and reasonable requests for information over a two and one-half year period that there was a dispute concerning the flat fee amount. Friesen's lack of diligence and communication with his clients compounded the issue. He never informed the Nevarezes that there must be a misunderstanding and the amount in question is a flat fee. He never took the initiative to resolve the problem so his clients could receive the services they were most concerned about, the college accounts. We find the OBA has proven by clear and convincing evidence that Friesen violated Rules 1.3 and 1.4 ORPC.

C. RULE 1.5 ORPC VIOLATION

¶15 Friesen accepted a non-refundable flat fee of $97,438.00 to draft five wills, four trusts, three annuities and to protect the Nevarezes' $350,000.00 if the need should arise. He testified he normally charges as much as $15,000.00 per will and trust but he had not itemized all the services for the Nevarezes. Some of the services for the children would not be performed for as many as fifteen years in the future. However, there was to be no delay in performing some of the other work including the college accounts. The record reflects the work Friesen performed over the three and one-half year representation consisted of spending approximately one hour a month reviewing and mailing the Nevarezes' three bank statements.

¶16 Contracts between attorneys and their clients regarding compensation stand on the same footing as any other contract and are upheld unless contrary to law, oppressive, fraudulent or the fee is obviously disproportionate to the services rendered. State ex rel. Okla. Bar Ass'n v. Weigel, 2014 OK 4, ¶23, 321 P.3d 168. Rule 1.5 ORPC provides a lawyer shall not make an agreement for, charge or collect an unreasonable fee. This rule gives several factors in determining the reasonableness of a fee, two of which are the results obtained and any time limitations imposed. In State ex rel. Oklahoma Bar Ass'n v.Wright this Court found Rule 1.5 ORPC was violated where an attorney who ultimately performed the agreed-upon work did not do so diligently. 1997 OK 119, ¶47, 957 P.2d 1174. We determined the clients paid for diligent, timely representation with periodic communication, which none received. Wright, 1997 OK 119 at ¶47. We held the results and time considerations did not warrant the respondent's fee. Id. Here, the Nevarezes paid to have, among other things, three college accounts created for their children. It was important to the Nevarezes to have those established as quickly as possible so they could start earning interest. The record reflects through Friesen's lack of diligence and meaningful communications these accounts were never created. Based on the evidence presented and our holding in Wright, we find the OBA has proven by clear and convincing evidence Friesen violated Rule 1.5 ORPC.

D. RULE 1.1 ORPC AND RULE 1.3 RGDP VIOLATIONS

¶17 Rule 1.1 ORPC requires a lawyer to provide competent representation to a client. The primary requirements to establish competence are "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." The Trial Panel acknowledged there was no evidence presented to establish Friesen was not competent to perform the services for which he was hired. However, the Trial Panel also noted it was clear by Friesen's own admissions he lacked competence in the Oklahoma Rules of Professional Conduct. The fact he took an advance fee and treated it as earned prior to performing the agreed-upon work shows a lack of competence in his understanding of these rules. The OBA asserted Friesen lacked competence in his representation of the Nevarezes. Over the three and one-half year representation Friesen failed to recognize through his client's repeated requests for information that something was wrong. During this time Friesen claimed to have sent annuity proposals to the Nevarezes but could not support his claim with evidence. The record reflects that Alma Nevarez received bank statements and a Spanish version of the same structured settlement brochure she received during mediation. This brochure was mailed to her on December 11, 2013, almost three and one-half years after the second attorney-client agreement was executed. The OBA claims over this period Friesen failed to adequately take the steps necessary to competently represent the Nevarezes. We agree. His actions show a lack of the required thoroughness and preparation that was reasonably necessary for this representation. We find the OBA has proven by clear and convincing evidence Friesen violated Rule 1.1 ORPC.

¶18 Rule 1.3 RGDP provides that actions by lawyers which bring discredit upon the legal profession shall be grounds for disciplinary action. The evidence presented was clear, Alma Nevarez felt betrayed by Friesen. Alma testified the delay in getting meaningful information concerning the college accounts caused marital problems. Her husband accused her of stealing the $97,438.00 and left the house for a period of time. Dowell testified how emotionally raw Alma was and how she would cry about the situation every time he would talk to her. Alma testified that she waited so long to go to another attorney because it was essentially unfathomable to her that she could not trust her attorney. She kept waiting for Friesen to follow through on the college accounts and had faith in him because he was a lawyer. We find the OBA has proven by clear and convincing evidence Friesen violated Rule 1.3 RGDP.

E. MITIGATION, ENHANCEMENT AND DISCIPLINE

¶19 Friesen maintains as his defense that he was unaware of a problem until the Nevarezes sued him. He claims he was waiting on information from the Nevarezes in order to set up the college accounts. Friesen presented lawyer witnesses who testified favorably concerning his competency and ethics. The OBA General Counsel mentioned he was a good lawyer in her closing statement. Friesen offered as mitigation the fact he stipulated to the violation of Rule 1.15 ORPC, he has revised his contracts so they are no longer non-refundable and he understands he must place all advanced fees into his trust account. In addition, Friesen asserted he paid the Nevarezes the full $97,438.00 and their costs incurred in the settlement prior to the bar complaint.

¶20 In fashioning the degree of discipline imposed for misconduct, this Court shall consider prior misconduct. Rule 1.7 RGDP. The record reflects Friesen has been disciplined twice. The OBA alleged Friesen was previously suspended for a period of approximately seven months after a conviction for willful failure to pay taxes. State ex rel. Okla. Bar Ass'n v. Friesen, 2015 OK 34, 350 P.3d 1269. He also received a private reprimand from the Professional Responsibility Commission in 2009. The private reprimand was based on Friesen's misdemeanor plea of guilty for failing to maintain a required acquisition and disposition log for the purchase and sale of firearms. Although neither disciplinary action directly involved clients, his actions bring discredit to the legal profession.

¶21 This Court's responsibility in disciplinary proceedings is not to punish the offending lawyer; the purpose of discipline is to protect the public, preserve the integrity of the bar and deter similar misconduct. State ex rel. Okla. Bar Ass'n v. Beasley, 2006 OK 49, ¶34, 142 P.3d 410. In determining appropriate discipline it is proper to compare the matter at hand with previous disciplinary matters. State ex rel. Okla. Bar Ass'n v. Doris, 1999 OK 94, ¶38, 991 P.2d 1015. However, this Court has recognized the extent of discipline must be decided on a case-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances. Doris, 1999 OK 94 at ¶38.

¶22 We have imposed a wide range of discipline in matters where the lawyer did not earn an advance fee or failed to return it and where a lawyer has failed to communicate and diligently represent a client. Like the case before us, our previous cases dealt with many rule violations. In State ex rel. Okla. Bar Ass'n v. Perkins, 1988 OK 65, 757 P.2d 825, failure to promptly repay client funds upon request coupled with other misuses of client's funds without mitigating circumstances warranted disbarment. In State ex rel. Okla. Bar Ass'n v. Wright, 1997 OK 119, 957 P.2d 1174, a lawyer who was negligent in performing work and was not diligent and prompt in performing services for which he was paid in advance by some nine clients, received a suspension for two years and one day. In State ex rel. Okla. Bar Ass'n v. Sheridan, 2003 OK 80, 84 P.3d 710, a lawyer was suspended for six months for neglect and lack of diligence in communicating with clients, handling client's money, communicating with the bar association and refusing to return a retainer. In State ex rel. Okla. Bar Ass'n v. Whitely, 1990 OK 46, 792 P.2d 1174, a lawyer received a public censure for failing to act with reasonable diligence, keeping a client reasonably informed about the status of a matter, failing to comply with reasonable requests for information, and taking an unreasonable fee.

¶23 The OBA recommends this Court follow the discipline in Whitely and publicly censure Friesen. The Trial Panel recommends Friesen be suspended from the practice of law for one year. The second attorney-client agreement was especially disturbing to the Trial Panel. It found that at the time this agreement was executed Friesen was in severe economic distress. He owed back taxes for many years prior to the agreement which culminated into a federal conviction in 2014. State ex rel. Okla. Bar Ass'n v. Friesen, 2015 OK 34, 350 P.3d 1269. Friesen testified he initially had the wrongful death settlement proceeds placed in Lana Cohlmia's trust account because he was worried the Oklahoma Tax Commission might garnish his trust account. The Trial Panel was also astounded that Friesen would fashion an agreement that included provisions for the Nevarezes to pay up-front for services that would only be performed some fifteen years in the future. Their conclusion was the agreement was motivated by Friesen's own interests rather than the best interests of the Nevarezes.

¶24 The record reflects the second attorney-client agreement was not understood; a fact that should have been clear to Friesen during the two and one-half years Alma Nevarez attempted to find out what happened to the $97,438.00. The Nevarezes never received what they bargained for, diligent representation to establish the college accounts. They not only lost years of earnings on these college accounts but also suffered emotional stress and damage to their relationship. These issues were not hidden from Friesen. Instead of taking the initiative to inform the Nevarezes that they were mistaken about the $97,438.00 and risk having to return any unearned fees, he kept towing them along indefinitely. When Dowell requested Friesen to return any unearned fees Friesen testified he refused because he did not like the insinuation he stole from his clients. Friesen's response did not explain the fee arrangement in the second attorney client agreement. Alma testified she never received a copy of the agreement; therefore she was unable to give Dowell a copy. It was not until Friesen was sued that he returned the $97,438.00 some four months later. Friesen claims in his brief that there was too little time to return the fees prior to the lawsuit being filed, which occurred approximately one week after Friesen responded to Dowell. However, if Friesen had responded appropriately to Dowell's letter and explained the fee agreement and offered to return any unearned fees the lawsuit would most likely not have been filed. Again, it is another example of Friesen blaming someone else for circumstances that were well within his control to prevent. We are also disturbed by the second attorney-client agreement as well as the suspicious nature of Exhibits B and C and the excuses supporting their sudden appearance. Based upon these concerns, the many rule violations and past discipline we cannot agree with the OBA that a public censure would provide sufficient discipline necessary to deter such behavior in the future.

IV. COSTS

¶25 The OBA filed an application to assess the costs of the investigative and disciplinary proceedings in the amount of $3,385.82 against Friesen. The application is supported by documents attached thereto. Friesen has not filed an objection to the application. The OBA's application is granted. Friesen is ordered to pay costs in the amount of $3,385.82 within ninety (90) days from the date of this opinion in accordance with Rule 6.16 RGDP.

V. CONCLUSION

¶26 We find there is clear and convincing evidence Friesen violated Rules 1.1, 1.3, 1.4, 1.5, and 1.15 ORPC and Rule 1.3 RGDP as set forth herein. We further conclude Friesen's professional misconduct warrants discipline. We order Respondent, Larry Douglas Friesen, be disbarred from the practice of law, his name be stricken from the roll of attorneys, he comply with Rule 9, RGDP, and he bear the costs as provided herein.

RESPONDENT DISBARRED; ORDERED TO PAY COSTS.

¶27 REIF, C.J., COMBS, V.C.J., and KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, and COLBERT, JJ., concur.

¶28 GURICH, J., not participating.

FOOTNOTES

[1] Lana Cohlmia is an attorney and close friend of Friesen. Friesen testified at the May 4, 2016, hearing that the Oklahoma Tax Commission had previously garnished his trust account and he was worried about depositing the settlement proceeds into his trust account and Lana agreed to deposit the check into her trust account.

[2] This amount was established after deducting $350,000.00 plus an additional $15,000.00 for funeral expenses from the $462,438.00 settlement proceeds.

[3] Alma Nevarez testified at the May 4, 2016, hearing that at the time of the Woodward meeting she was unaware of anyone wanting to sue them.

[4] Alma Nevarez: Transcript of the hearing held on May 4, 2016, pp. 128-129:

I've called and tried to get him to send me this stuff. His secretary said they would get it to me. And I mean, with working and stuff, sometimes it would drag months and sometimes weeks or whatever. But then we started having constant problems because he's [Oscar] like "you need to find out where that money is at". "What's happening with the money because it's not ----" you know, and this -- the secretary would tell me, you know, this, this. "We had changed staff or the paperwork was wrong but we'll send it to you later". And there at the end they wouldn't -- they would send me to Doug to talk to Doug because they didn't want to answer my questions. And then I think I talked to Doug a couple of times and he said he was going to go down there and take the paperwork so I wouldn't have to come up here and get it. And I didn't get it, and I called again, and he said they had done the papers wrong but he would get it to me. And it was just constant. I would never get any information.

[5] This is reflected in the July 9, 2013, time entry for Terri Dennis, Friesen's legal assistant. See n.6.

[6] Complainant's Ex. 7, time entries logged for Terri Dennis, Friesen's legal assistant, highlights the following ten entries:

May 12, 2011 Returned phone call to Alma Nevarez regarding her daughters' accounts that we were going to set up for them. She never received anything in the mail so she was wondering if those accounts are in place. I had a meeting with Doug regarding her concern and he will be mailing the paperwork to her.

June 10, 2011 Phone call from Ms. Nevarez regarding the paperwork for her daughters' accounts. Doug has been notified to send them to her.

Sept. 14, 2011 Phone call from Alma Nevarez regarding accidental death insurance on the children, advised her I would check with Doug and call her back

Nov. 26, 2012 Client Info. Called to follow up on conversation from last week with Analy (sic). She had some questions about the trust funds and I was to get with DF on the matter. Tried to leave message to let her know that I would get back with her later this week. There was no messaging services and could not leave one.

April 29, 2013 Phone call - long distance to Alma regarding accounts for children; left message at 2:33 p.m.

April 29, 2013 Phone call from client; the accounts are set up but we do not get monthly statements; will send her copies of where the accounts are and how much is in them.

July 9, 2013 Phone call from Ms. Nevarez; her husband is very upset; it has been four years and they still do not know where the money is and it is gathering interest; Doug stated over a year ago that he would be in the area and drop stuff off for them and they have received nothing. They want a phone call tomorrow after 1:30 pm.

July 10, 2013 Phone call with Alma Nevarez.

July 23, 2013 Phone call from Alma; Doug told her he would have someone mail the information to her last week and she has not received anything.

October 3, 2013 Phone call-long distance, called client and let her know Doug would forward her the information from the insurance company as soon as he receives it.

[7] Rule 1.15 (a) and (b) ORPC, 5 O.S. 2011, ch. 1, app. 3-A, provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

. . . .

(c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

[8] Rule 1.15 (d) and (e) ORPC, 5 O.S. 2011, ch. 1, app. 3-A, provides:

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

. . . .

(e) When in connection with a representation, a lawyer possesses funds or other property in which both the lawyer and another person claim interests, the funds or other property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved, and the undisputed portion of the funds shall be promptly distributed.

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 65, 757 P.2d 825, State ex rel. Oklahoma Bar Ass'n v. Perkins
Discussed
 1990 OK 46, 792 P.2d 1174, State ex rel. Oklahoma Bar Ass'n v. Whiteley
Discussed
 1994 OK 12, 870 P.2d 770, State ex rel. Oklahoma Bar Assn. v. Livshee
Discussed
 2003 OK 80, 84 P.3d 710, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SHERIDAN
Discussed
 2006 OK 49, 142 P.3d 410, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BEASLEY
Discussed
 2006 OK 50, 142 P.3d 420, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILBURN
Discussed
 2013 OK 42, 304 P.3d 453, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. COOLEY
Discussed
 2014 OK 4, 321 P.3d 168, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WEIGEL
Discussed
 2014 OK 96, 339 P.3d 895, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HART
Discussed
 2015 OK 34, 350 P.3d 1269, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN
Discussed at Length
 1999 OK 94, 991 P.2d 1015, 70 OBJ 3622, State ex. rel. Oklahoma Bar Association v. Doris
Discussed at Length
 1997 OK 119, 957 P.2d 1174, 68 OBJ 3105, STATE ex rel. OKLAHOMA BAR ASS'N v. WRIGHT
Discussed at Length