STATE ex rel. OKLAHOMA BAR ASSOCIATION v. PISTONIK



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. PISTONIK

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. PISTONIK
2020 OK 93
Case Number: SCBD-6859
Decided: 11/24/2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 93, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

State of Oklahoma ex rel. Oklahoma Bar Association, Complainant,
v.
Bradley A. Pistotnik, Respondent.

PROCEEDING FOR BAR DISCIPLINE

¶0 This is a summary disciplinary proceeding initiated pursuant to Rule 7.1 and 7.2 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2011, ch. 1, app. 1-A, based upon Respondent Bradley Alan Pistotnik's guilty plea to three misdemeanor charges of Accessory After the Fact in violation of 18 U.S.C. § 3. On October 16, 2019, the United States District Court for the District of Kansas sentenced Respondent, ordering him to pay a fine of $375,000, restitution of $55,200, and a special assessment of $300. On October 31, 2019, the Oklahoma Bar Association ("OBA") transmitted to this Court a certified copy of the record relating to the conviction, and on November 18, 2019, we ordered Respondent's immediate interim suspension. Following a mitigation hearing, the Professional Responsibility Tribunal ("PRT") concluded Respondent was not forthright in his testimony and recommended a one-year suspension. Upon de novo review, we find that a suspension for two years and a day serves the important goals of discipline.

RESPONDENT IS SUSPENDED FOR TWO YEARS AND ONE DAY, EFFECTIVE FROM THE DATE OF THIS OPINION, AND ORDERED TO PAY COSTS.

Attorneys and Law Firms:

Katherine M. Ogden, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Charles F. Alden, III, Jack S. Dawson, and Amy L. Alden, Oklahoma City, Oklahoma and Sheila J. Naifeh, Tulsa, Oklahoma, for Respondent.

DARBY, V.C.J.:

I. FACTUAL BACKGROUND

¶1 Respondent Bradley Alan Pistotnik was admitted to the practice of law in the State of Oklahoma in 1981 and in the State of Kansas in 1982. Respondent attended the University of Kansas School of Law, and he currently lives in Wichita, Kansas. He maintains clients in both states with the majority of his practice being in Kansas. Respondent's federal criminal conviction in Kansas arose from his conduct in 2014, after he hired a web developer, David Dorsett, to build a website for his newly formed law firm. Respondent opened this new law office following a contentious dissolution of his old firm and partnership with his brother. The winding up of that business led to competing lawsuits between the brothers, including an action for receivership to retain control over clients, and a court order from a Kansas judge directing them to disable the old website, www.pistotniklaw.com, and create their own independent sites. Hr'g Tr., 120-21.

¶2 On September 15, 2014, after receiving an email advertisement from David Dorsett, Respondent reached out, and the two met at Respondent's law office. During this initial meeting, Respondent hired Dorsett to: 1) build the new website, 2) serve as an information technology expert in the dissolution proceeding, and 3) provide assistance with online reputation management. Respondent was concerned that after the fallout at the firm, his brother may be publishing negative information about him online. At the conclusion of the meeting, Respondent wrote Dorsett a check for $5,000, and gave him full access to his office computers and passwords. Id. at 124.[1]

¶3 Four days later, on September 19, 2014, Respondent met with Dorsett a second time. Dorsett instructed Respondent to search for his name online to see what results appeared. Respondent did so the following day and located an article on RipoffReport.com describing him as a criminal. Respondent immediately emailed Dorsett the following: "Dave look at this new page from yesterday and tell me how we get rid of it[;] states created yesterday[.]" Complainant's Ex., 2. Dorsett informed Respondent he had a friend who could "de-index" negative articles and build new positive pages to make the unwanted content appear further down in the search results. Hr'g Tr., 127. Respondent testified that he agreed only to this legal de-indexing service. Id. at 128-29. On September 22, 2014, Respondent also emailed Dorsett: "Dave, can you find the IP address for this site and particular claim number to establish the location of the sender?" Complainant's Ex., 3. Respondent titled both of these emails: "Ripoff Report" and "Ripoff page," respectively.

¶4 Six days later, on September 25, 2014, Dorsett sent extortionate threats and initiated a flood of emails to the servers of Ripoff Report[2], Leagle[3], and the Arizona law firm that represented Ripoff Report, in effort to frustrate the recipients and cause them to remove all information pertaining to Respondent. Resp's Ex., 4, 2. These emails impaired the servers of Ripoff Report, Leagle, and the Arizona law firm, rendering their communications and data inaccessible. Along with the emails, Dorsett sent the following threat separately to all three victims, each reflecting the particular site's name:

Remove this page and we stop [link of subject article removed] . . . [I]f you don't remove it we will begin targeting your advertisers and explain that this will stop happening to them once they pull their ads from leagle.com or leagle.com kills this page . . . [link removed] You have 4 hours before we start hitting your advertisers.

Id.

¶5 Later this day, as the communications were still inundating the businesses, two attorneys from the firm representing Ripoff Report contacted Respondent at his law office. The attorneys advised Respondent they were recording the phone call. This recording is included in the record before this Court. Complainant's Ex., 7. The lawyers told Respondent that based on the threats regarding negative content about him, Respondent was their only link for determining who was responsible. Respondent denied having any knowledge or involvement and falsely stated that he had never asked or hired anyone to help him with reputation management. The lawyers asked Respondent repeatedly if he knew any information that could help them in anyway, emphasizing that their servers were on the brink of crashing unless they identified the attacker. The lawyers informed Respondent they were turning the matter over to the FBI. Respondent then began shifting the blame to his brother, stating how he was involved in contentious litigation with him so he would most likely be the culprit. Respondent said he would "call around" to see if he could find out anything but reemphasized falsely that he had "not hired anybody," so whoever was responsible was "doing it on their own."[4]

¶6 Immediately after hanging up, Respondent called Dorsett, who confirmed the attacks. According to Respondent, he "chewed him out" and "screamed at him," asking "what the hell was wrong with him." Hr'g Tr., 156. Ripoff Report ultimately acquiesced in the ransom and removed the negative review the same day. Dorsett also sent Respondent an email detailing his methods and confirming the successful removal. Four days later, on September 29, 2014, Dorsett emailed Respondent again, this time attaching an invoice listing the reputation services related to the attacks and noting: "I'm pretty sure nobody has ever gotten a full removal from either of those sites, and no reputation companies will even attempt it for under $2,500 per page." Complainant's Ex., 4. Respondent paid the invoice by check the same day.[5]

¶7 Even if Respondent was initially unknowing of Dorsett's plan, after the attacks he chose to persist in the lie, not contact the lawyers, and then pay for the completed scheme. It was not until months later that Respondent learned Dorsett had actually caused the publication of the negative articles in a larger ploy to also extort Respondent in addition to the other three victims. At this point, Respondent went to the FBI and reported Dorsett. Doing so, he described the events as if he was completely innocent in the scheme. In fact, Respondent was initially listed as a victim in the FBI's investigation initiated against Dorsett alone. Hr'g Tr., 188. The FBI agent who investigated the criminal case testified at the PRT hearing that it was not until later in the investigation against Dorsett that their office discovered Respondent had excluded two incriminating emails from evidence when reporting Dorsett for extorting him. Id. at 195. At this point, the FBI learned the full extent of Respondent's business relationship with Dorsett. Id. In summary, Respondent accepted and helped conceal the fraud when he believed it was carried out to his benefit and then reported it only after learning the larger scheme was against him as well. Respondent's dishonesty regarding the true nature of his and Dorsett's involvement in the attacks led to his criminal conviction.

¶8 On July 17, 2018, after much investigation and several delays in the prosecutions of both men, the United States Attorney's Office ("USAO") for the District of Kansas filed a ten-count Indictment against Respondent in United States v. Pistotnik, Case No. 18-CR-10099-01.[6] Following plea negotiations, Respondent agreed to plead guilty to three counts of Accessory After the Fact, in violation of 18 U.S.C. § 3.[7] The USAO filed the three-count Information on October 15, 2019. The following day, the United States District Court for the District of Kansas accepted the plea, adjudicated Respondent guilty, and sentenced him to payment of a $375,000 fine, restitution of $55,200, and a special assessment of $300, all due immediately in a lump sum of $430,500. Respondent paid this amount in full on the day of his plea and sentencing.

II. BAR DISCIPLINARY PROCEEDINGS

¶9 On October 31, 2019, the OBA filed its notice and certified copies of the record relating to the conviction pursuant to Rule 7.2 of the RGDP. Respondent requested to provide supplemental information relevant to the appropriateness of an interim suspension. The Court denied Respondent's request and on November 18, 2019, entered an order of immediate interim suspension. The Court directed Respondent to show cause, if any, no later than December 4, 2019, why the interim suspension should be set aside and to request a hearing before the PRT. Respondent filed a response on December 4, 2019, asserting that he should not be interim suspended and the matter should be dismissed. On December 30, 2019, Respondent requested the mitigation hearing. On January 2, 2020, the Court granted the Rule 7 hearing on the limited scope of mitigation and recommendation of discipline.

¶10 On January 15, 2020, the Court granted Respondent's unopposed motion for a continuance. Respondent then filed a Motion to Stay Proceedings pending resolution of the bar disciplinary proceeding initiated in the State of Kansas. The OBA objected, and on March 9, 2020, the Court ordered the mitigation hearing to proceed. Evidence regarding discipline imposed in that case, if any, is not included in the record before this Court. Based on both the first and third emergency orders regarding the COVID-19 state of disaster, the PRT continued the mitigation hearing on two occasions, first on March 9, 2020, and then on May 7, 2020. The PRT ultimately held the hearing on June 5, 2020. Respondent presented exhibits and seven character witnesses, including himself, and the OBA presented exhibits and two witnesses. The PRT filed its report on July 6, 2020, and the Court received the completed record with all briefs on August 21, 2020.

¶11 Respondent asks this Court to impose a private reprimand as discipline for his conduct. The OBA recommends a six-month suspension, retroactive to the date of interim suspension. The PRT rejects both of these recommendations and asserts that suspending Respondent for a period of one year, effective from the date of our opinion, is necessary to accomplish the goals of discipline.

III. PRIOR DISCIPLINE

¶12 Respondent has been previously disciplined in the State of Kansas on five occasions. Complainant's Ex., 1. The Kansas Office of the Disciplinary Administrator confirms that Respondent has received four informal admonitions and one suspension from the practice of law for a period of one year. The four informal admonitions, which are public but unpublished forms of discipline, date back to 1985, 1991, and 1994. Kansas suspended Respondent's license in 1993, for rule violations involving conflicts of interest and misconduct with clients. Recognizing these incidents of discipline date back more than two and three decades, we do not accord them undue weight but rather reference them in context with Respondent's full legal career.

IV. STANDARD OF REVIEW

¶13 This Court possesses original, exclusive, and nondelegable jurisdiction over all attorney disciplinary proceedings in this State. 5 O.S.2011, § 13; RGDP, Rule 1.1. The purpose of the Court's licensing authority is not to punish the offending lawyer but to safeguard the interests of the public, the courts, and the legal profession. State ex rel. Okla. Bar Ass'n v. Friesen, 2016 OK 109, ¶ 8, 384 P.3d 1129, 1133. In a Rule 7 summary disciplinary proceeding, generally the central concern is to inquire into the lawyer's continued fitness to practice and determine what discipline should be imposed. State ex rel. Okla. Bar Ass'n v. Drummond, 2017 OK 24, ¶ 19, 393 P.3d 207, 214; State ex rel. Okla. Bar Ass'n v. Hastings, 2017 OK 43, ¶ 17, 395 P.3d 552, 557. The range of permissible inquiry stands confined to issues germane to mitigation or severity of discipline to be visited upon the offending attorney. State ex rel. Okla. Bar Ass'n v. Livshee, 1994 OK 12, ¶2, 870 P.2d 770, 772. To administer discipline evenhandedly, the Court considers prior decisions involving similar misconduct, but "the extent of discipline must be decided on a case-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances." State ex rel. Okla. Bar Ass'n v. Wilcox, 2014 OK 1, ¶ 48, 318 P.3d 1114, 1128.

¶14 The Court considers de novo every aspect of a disciplinary inquiry, and the PRT's findings of fact, conclusions of law, and recommendation of discipline are not binding on this Court. State ex rel. Okla. Bar Ass'n v. Ezell, 2020 OK 55, ¶ 13, 466 P.3d 551, 554; State ex rel. Okla. Bar Ass'n v. Cooley, 2013 OK 42, ¶ 4, 304 P.3d 453, 454. The record consisting of the Notice of Deferment[8], transcripts, exhibits, PRT Report, briefs, and Application to Assess Costs is sufficient for the Court's de novo review and determination of appropriate discipline.

V. DISCIPLINE

¶15 "A lawyer who has been convicted or has tendered a plea of guilty or nolo contendere . . . in any jurisdiction of a crime which demonstrates such lawyer's unfitness to practice law . . . shall be subject to discipline." RGDP, Rule 7.1. The record of conviction constitutes "conclusive evidence of the commission of the crime . . . and shall suffice as the basis for discipline." RGDP, Rule 7.2. While "a criminal conviction does not ipso facto establish an attorney's unfitness to practice law," State ex rel. Okla. Bar Ass'n v. Trenary, 2016 OK 8, ¶ 12, 368 P.3d 801, 806, the commission of any act that would reasonably "bring discredit upon the legal profession, shall be grounds for disciplinary action." RGDP, Rule 1.3.

¶16 It is professional misconduct for an attorney to "commit a criminal act which reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Rule 8.4(b), Oklahoma Rules of Professional Conduct ("ORPC"), 5 O.S.2011, ch.1, app. 3-A. It is also professional misconduct to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." ORPC, Rule 8.4(c). A misrepresentation under Rule 8.4(c) of the ORPC requires clear and convincing evidence that the lawyer had an underlying bad intent and made the misrepresentation for the purpose of deceiving. State ex rel. Okla. Bar Ass'n v. Besly, 2006 OK 18, ¶ 43, 136 P.3d 590, 605.

¶17 This Court has repeatedly disbarred attorneys following convictions for crimes involving dishonest conduct. See, e.g., State ex rel. Okla. Bar Ass'n v. Shofner, 2002 OK 84, 60 P.3d 1024 (disbarment after federal conviction for fraudulently concealing assets in bankruptcy proceeding); State ex rel. Okla. Bar Ass'n v. Crabtree, 1995 OK 123, 907 P.2d 1045 (disbarment after federal conviction for money laundering and fraudulently concealing assets in bankruptcy proceeding); State ex rel. Okla. Bar Ass'n v. Hornung, 1991 OK 56, 813 P.2d 1041 (disbarment following two federal convictions for conspiring to conceal taxable income and facilitating an unlawful interstate business enterprise). In certain disciplinary cases involving crimes of dishonesty, however, we have imposed discipline less severe than disbarment. In State ex rel. Okla. Bar Ass'n v. Dennison, 1994 OK 33, 872 P.2d 403, we imposed a 31-month suspension following the attorney's conviction for making false statements to a financial institution. In State ex rel. Okla. Bar Ass'n v. Willis, 1993 OK 138, 863 P.2d 1211, we imposed a 15-month suspension following the attorney's felony conviction for obtaining controlled substances by misrepresentation. In State ex rel. Okla. Bar Ass'n v. Simms, 1978 OK 153, 590 P.2d 184, we imposed a suspension for more than 20 months after the attorney was convicted for willfully making and subscribing tax returns believing them to not be true.

¶18 We particularly note two previous cases involving dishonest conduct similar to that of Respondent. In State ex rel. Okla. Bar Ass'n v. Harlton, 1983 OK 87, ¶ 1, 669 P.2d 774, 774, the attorney pled guilty in the United States District Court for the Northern District of Oklahoma for failing to disclose evidence used in the commission of the crime to help his client avoid detection. Knowingly and with the purpose of deceiving, Harlton "embraced the role of an accessory to a crime as a personal accommodation to its perpetrator." The Court suspended Harlton's license for five years. In State ex rel. Oklahoma Bar Ass'n v. Kirk, 1986 OK 9, 6, 723 P.2d 264, 264, the attorney pled no contest to conspiracy to commit an offense or defraud the United States in violation of 18 U.S.C. § 371. There the attorney actively engaged in a scheme to mislead federal immigration officials by representing that his client was legitimately married to an American citizen despite knowing the marriage was entered into solely for the purpose of securing immigration documents. Kirk made the fraudulent representations and then accepted a fee for his services. We suspended Kirk's license for five years.

¶19 Here, Respondent acted as an accessory after the fact and paid for rather than accepted payment for illegal conduct. Additionally, the misrepresentations made in Harlton and Kirk were motivated, in part, by a misguided desire to protect a client. Here, Respondent's misrepresentations and criminal payment of Dorsett were motivated by a desire to protect himself and avoid detection of his own involvement in the crime. The fraud that Respondent covered up and paid for did not involve a client or a case he was handling for a client. His actions did, however, involve his handling of the dissolution proceeding in which he was a litigant and in many ways acting in his professional capacity as a lawyer.

VI. DISCUSSION

¶20 Even if Respondent initially hired Dorsett innocently and without knowing he would act illegally, conclusive evidence of Respondent's guilty plea and conviction establishes he acquiesced in the scheme after the fact. After the attorneys for RipoffReport.com informed Respondent of the cyberattacks, he repeatedly and knowingly lied to these victims, denying he had ever hired or spoken to anyone about assisting him with reputation management. In reality, just days before this, Respondent had not only hired Dorsett, but had sent him the precise link of the negative review on Ripoff Report, asking him "how we get rid of it."

¶21 Respondent continued denying any knowledge of the scheme even after the lawyers proffered that Respondent could have been a completely innocent bystander. Despite this opportunity, Respondent doubled down and pointed the finger at his brother. Confirming the truth immediately after the phone call, Respondent chose not to inform the lawyers of Dorsett's identity and allowed the attacks to continue damaging the servers. Most telling of all, Respondent then paid Dorsett after that verbal communication and after Dorsett sent two emails describing his methods and touting the success of the extortion. Hr'g Tr., 176; PRT Report, 3. The record shows clearly and convincingly that Respondent misrepresented and withheld facts with an underlying bad intent and for the purpose of deceiving.

¶22 This behavior of dishonesty is precisely what Respondent pled guilty to in federal court. Yet, in the mitigation hearing before the PRT, Respondent equivocated regarding his culpability and involvement in the scheme. The PRT described that it was "suspect of the truthfulness of Respondent during his testimony" at the mitigation hearing and concluded he "was not forthright with his version of the facts." PRT Report, 3. The PRT found notable that Respondent testified that Dorsett acted outside the parameters of what he ever intended him to do, yet admitted that he paid Dorsett after fully appreciating the criminal nature of his conduct. Id.

¶23 In mitigation, Respondent self-reported his criminal conviction in Kansas to the OBA. He also timely filed the required affidavit of compliance with RGDP, Rule 9.1, withdrawing from his cases in Oklahoma. Nothing in the record suggests Respondent has violated his interim suspension. Respondent's witnesses at the PRT hearing testified to his involvement in charitable organizations and his reputation in the Wichita legal community for working diligently for his clients. Many of these witnesses testified that the criminal conviction was outside of Respondent's character. All of Respondent's witnesses, however, admitted under cross-examination that they were "not aware of the exact crimes to which Mr. Pistotnik pled guilty, nor were they aware of any other details other than what they read in the news media." PRT Report, 2.

¶24 The criminal investigation and Respondent's conviction in federal court garnered considerable media attention, both in Kansas and nationally. These publications identified Respondent as a practicing attorney. His misconduct reflected poorly on the OBA and brought disrepute on the legal professional as a whole. A review of the record, particularly Respondent's testimony at the mitigation hearing, reveals he does not fully accept responsibility for his illegal conduct and largely maintains he was an innocent pawn in Dorsett's scheme.[9] Even following his guilty plea and conviction, Respondent does not show sincere remorse aside from the embarrassment his actions have caused him and his family. Considering appropriate discipline, we note that while handing down a conviction, the federal district court sentenced Respondent to payment of fines and restitution rather than a term of confinement.

VII. CONCLUSION

¶25 Respondent pled guilty to three criminal misdemeanors predicated on deceit. He carried out these misrepresentations in protection of his own interests to the detriment of others. Respondent's crimes involved fraudulent conduct as a litigant and in many ways in his professional capacity as a lawyer. Upon de novo review, we conclude that a suspension of two years and a day will best serve the welfare of the public and maintain the integrity of the bar. Because Respondent will be suspended for a period exceeding two years, reinstatement is not automatic. See RGDP, Rule 11.1. Upon applying for reinstatement, Respondent must satisfy all requirements of RGDP 11, and present stronger proof of his qualifications than a person seeking admission for the first time. RDGP, Rule 11.4; In re Reinstatement of Mumina, 2009 OK 76, ¶ 8, 225 P.3d 804, 809. The OBA's Application to Assess Costs is granted. Respondent is ordered to pay costs in the amount of $2,465.40, within 90 days after the date of this opinion. RGDP, Rule 6.16.

RESPONDENT IS SUSPENDED FOR TWO YEARS AND ONE DAY, EFFECTIVE FROM THE DATE OF THIS OPINION, AND ORDERED TO PAY COSTS.

Darby, V.C.J., Winchester, Edmondson, Combs, Kane and Rowe, JJ., concur;

Gurich, C.J., and Kauger, J., concur in part; dissent in part;

Gurich, C.J., and Kauger, J., joins, concurring in part; dissenting in part;

I would access a two-year suspension.

Colbert, J., dissents.

FOOTNOTES

[1] Respondent admitted in his signed plea agreement that Dorsett offered assistance with reputation management in his initial correspondence. Resp's Ex., 4, 2. He later denied this timing, however, in his testimony at the mitigation hearing. Hr'g Tr., 124-27, 149-54, 167-68.

[2] Ripoff Report is a website that publishes consumer reviews of businesses. Ripoff Report made available a negative review of Respondent.

[3] Leagle is a website that hosts opinions and cases from federal and state courts. Leagle made available an opinion from the Kansas Supreme Court's prior discipline of Respondent.

[4] Complainant's Ex., 7. We note the following portions of that exchange:

Lawyer: The emails that we are getting are demanding that we take that report down and if we don't they are going to target our - -
Respondent: I don't know who's doing that, but it's not me.
Lawyer: So my only question to you is, did you hire someone or ask somebody to help you with this problem. Because whoever you hired is breaking the law.
Respondent: No, I haven't had anybody do that. If somebody is doing that, they're doing it on their own.
Lawyer: Well, can you think of anybody that would want to help you in this way? Because again, we are, this is, this is very serious. This is my law firm's email server that is going to crash if this continues to happen. And --
Respondent: I don't know who that's from.
Lawyer: Well, the only way I can stop it is having my client, which I don't have the authority to do, take down the post about you. . . . So you're my only link to this, and I thought, it seemed to me like maybe you innocently may have hired somebody who said, "Hey, I can help you with this problem," not knowing that the way they were going to do it was illegal because that happens sometimes. So that's why I thought, let me call you and see if you go, "Ya, I hired some guy, but he didn't tell me he was going to do this."
Respondent: No, I have not hired anybody, so whoever is doing it is doing it on their own.
Lawyer: Did you possibly reach out, like investigating, you know, do some Google searches, find out who was offering to help, maybe have some phone calls, or whatever, you know just normal process?
Respondent: I haven't sent anybody an email, I'm not trying to do that.

Id.

[5] At the mitigation hearing, Respondent equivocated regarding his knowledge of this email detailing the attacks, denying he had ever seen it while at the same time admitting he had knowingly paid the invoice. Hr'g Tr., 152-54.

[6] The original ten counts of the Indictment included three counts for False Statements to an FBI Agent, five counts for Fraud in Connection with Computers, and two counts for Conspiracy to Commit Fraud in Connection with Computers. Notice of Deferment, Ex. 1, filed Oct. 31, 2019.

[7] Title 18, section 3 of the United States Code provides:

Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.

Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than fifteen years.

18 U.S.C. § 3. Dorsett's criminal conduct violated interstate communications under 18 U.S.C. § 875(b), which provides:

Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 875(b).

[8] The OBA notes that it titled this pleading in error. The Kansas federal district court did not defer Respondent's sentencing in this case.

[9] When asked how he believed the Court should discipline him, Respondent testified:

I've already been suspended now for over six months, and I've had an awful lot of publicity, which doesn't help the business. I would hope that the Bar would understand that I was, I don't know what you call it, but [I] was conned, and I would hope they would return my license and do a public censure.

Hr'g Tr., 160.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1991 OK 56, 813 P.2d 1041, 62 OBJ 1951, State ex rel. Oklahoma Bar Ass'n v. Hornung
Discussed
 1993 OK 138, 863 P.2d 1211, 64 OBJ 3290, State ex rel. Oklahoma Bar Ass'n v. Willis
Discussed
 1994 OK 12, 870 P.2d 770, State ex rel. Oklahoma Bar Assn. v. Livshee
Discussed
 1994 OK 33, 872 P.2d 403, 65 OBJ 1190, State ex rel. Oklahoma Bar Assn. v. Dennison
Discussed
 1995 OK 123, 907 P.2d 1045, 66 OBJ 3587, State ex rel. Oklahoma Bar Assn. v. Crabtree
Discussed
 2002 OK 84, 60 P.3d 1024, STATE ex. rel. OKLAHOMA BAR ASS'N v. SHOFNER
Discussed
 2006 OK 18, 136 P.3d 590, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BESLY
Discussed
 2009 OK 76, 225 P.3d 804, IN THE MATTER OF THE REINSTATEMENT OF MUMINA
Discussed
 2013 OK 42, 304 P.3d 453, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. COOLEY
Discussed
 2014 OK 1, 318 P.3d 1114, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILCOX
Discussed
 2016 OK 8, 368 P.3d 801, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. TRENARY
Discussed
 1978 OK 153, 590 P.2d 184, STATE EX REL. OKL. BAR ASS'N v. SIMMS
Discussed
 2016 OK 109, 384 P.3d 1129, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN
Discussed
 2017 OK 24, 393 P.3d 207, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. DRUMMOND
Discussed
 2017 OK 43, 395 P.3d 552, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HASTINGS
Discussed
 2020 OK 55, 466 P.3d 551, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. EZELL
Discussed
 1983 OK 87, 669 P.2d 774, State ex rel. Oklahoma Bar Ass'n v. Harlton
Discussed
 1986 OK 9, 723 P.2d 264, State ex rel. Oklahoma Bar Ass'n v. Kirk
Discussed
Title 5. Attorneys and the State Bar
 Cite
Name
Level

 5 O.S. 13, Power of Supreme Court
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA