STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SILVERNAIL
2022 OK 68
Case Number: SCBD-6874; Cons. w/6884
Decided: 06/28/2022
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2022 OK 68, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,
v.
JAY TAYAR SILVERNAIL, Respondent.
ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE
¶0 Complainant, the State of Oklahoma ex rel. Oklahoma Bar Association (OBA), brought disciplinary proceedings against Respondent, a licensed Oklahoma lawyer, after he was convicted of Assault and Battery with a Deadly Weapon by an Oklahoma County jury. The OBA alleges that the criminal conviction itself, as well as Respondent's attempts to maintain his law practice while in custody, violated the Rules of Professional Conduct for attorneys licensed in Oklahoma. For the reasons discussed below, we find clear and convincing evidence to support the imposition of professional discipline and assess costs against Respondent.
RESPONDENT DISBARRED; APPLICATION FOR COSTS GRANTED
Loraine Dillinder Farabow, First Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.
Dan Murdock, Edmond, Oklahoma, for Respondent.
KUEHN, J.:
¶1 Respondent Jay Silvernail was licensed to practice law in Oklahoma in 2009. In 2016, he was charged in Oklahoma County District Court, Case No. CF-2016-4381, with Assault and Battery with a Deadly Weapon. In October 2019, a jury found him guilty and recommended a sentence of two and one-half years in prison. Silvernail was immediately taken into custody pending formal sentencing. In November 2019, the Oklahoma Bar Association (OBA) filed an application for immediate interim suspension, pursuant to Rule 6.2A, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2011, ch. 1, app. 1-A. The OBA claimed that Silvernail was violating ethical rules by continuing to practice law while in the county jail. On learning of the OBA's complaint, Silvernail agreed to take steps to close his practice. This Court issued an Order of Immediate Interim Suspension in early December 2019 (SCBD Case No. 6874). Later that month, Silvernail was formally sentenced per the jury's verdict. Silvernail did not appeal his conviction. After Silvernail's sentencing, the OBA filed a second proceeding (SCBD Case No. 6884), pursuant to Rules 7.1 and 7.2, RGDP, citing his conviction for a felony offense as additional grounds for discipline. This Court consolidated the two proceedings.
¶2 Pursuant to Rule 6, RGDP, the Professional Responsibility Tribunal convened in August 2021 to consider the OBA's complaints. The Tribunal found clear and convincing evidence that Silvernail violated several Rules of Professional Conduct while attempting to maintain his practice from jail. The Tribunal also considered the circumstances surrounding Silvernail's felony conviction. The Tribunal recommended that Silvernail be suspended from the practice of law for two years and one day, with the suspension to begin immediately upon Silvernail's release from custody, and that he pay the costs of these disciplinary proceedings.
STANDARD OF REVIEW

¶3 This Court has exclusive original jurisdiction in bar disciplinary matters. State ex rel. OBA v. Taylor, , ¶ 2, , 21. When the Professional Responsibility Tribunal has been tasked with receiving evidence in disciplinary proceedings, we review its findings de novo. State ex rel. OBA v. Cox, , ¶ 10, , 1008. Allegations of misconduct must be proven by clear and convincing evidence. Rule 6.12(c), RGDP.
ANALYSIS
¶4 The OBA claims discipline is warranted because (1) Silvernail was convicted of a violent felony offense, and (2) Silvernail's attempts to maintain his law practice from jail demonstrated a conflict of interest and general disregard for his clients. We analyze each allegation in turn, reviewing the record presented to the Tribunal, which included live testimony, exhibits, and a transcript of Silvernail's criminal trial.
A. The circumstances surrounding Silvernail's conviction.
¶5 A lawyer convicted of any crime, in any jurisdiction, is subject to discipline if the conviction demonstrates "unfitness to practice law." Rule 7.1, RGDP. Crimes involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are typically among those which warrant discipline. Rule 8.4, Oklahoma Rules of Professional Conduct (RPC), 5 O.S.2011, ch. 1, app. 3--A, cmt. 2. This rule extends to any criminal act which "reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer... ." Rule 8.4(b), RPC. We consider the circumstances surrounding the offense to determine whether discipline is in order. See State ex rel. OBA v. Willis, , ¶ 23, 504 P.3d 1141, 1151; State ex rel. OBA v. Conrady, , ¶¶ 7-8, , 136. Criminal acts may warrant discipline even if they were not directly related to the practice of law. Id. at ¶ 9, 275 P.3d at 137. The fact that Silvernail stands convicted of a violent felony is not disputed. A transcript of the evidence from Silvernail's criminal trial was presented to the Tribunal, and we consider that evidence as well.
¶6 On an evening in May 2016, Silvernail shot Ryan DeJesus outside an Oklahoma City bar. The altercation occurred around closing time after DeJesus invited Ms. Anderson, a woman he had met at the bar, to leave with him. Several people were involved in discussions about who was leaving with whom and where they planned to go. Silvernail, who had been socializing with Anderson and her friends in the bar that night, testified at trial that he did not think Anderson was sober enough to make an informed decision about whether to leave with DeJesus.
¶7 At one point during these parking-lot negotiations, Silvernail walked to his own vehicle, retrieved a pistol, and chambered a round so the gun would be immediately ready to fire. He then returned and declared that Anderson would not be leaving with DeJesus. He poked DeJesus in the chest and raised the pistol. DeJesus responded by pushing Silvernail, who fell to the ground. Silvernail then shot DeJesus in the groin, hitting an artery. Despite many surgeries, DeJesus lost most of his right leg.
¶8 Silvernail claimed he was legally justified in using deadly force against DeJesus in defense of Anderson. Generally, the right to defend another person is coextensive with the right to defend oneself. One is justified in using deadly force only if one reasonably believes that he (or the person he is defending) is in imminent danger of death or great bodily harm. (2). The trial court did not instruct Silvernail's jury on the doctrine of defense of another, finding no evidence that Silvernail reasonably believed Anderson herself was in imminent personal danger. The court did, however, instruct the jury on the doctrine of self-defense. The jury rejected the self-defense theory and convicted Silvernail as charged. Nevertheless, it only recommended a sentence of two and one-half years imprisonment and a $10,000 fine. The maximum prison sentence available was life imprisonment. (C).
¶9 In State ex rel. OBA v. Conrady, the respondent lawyer, upset after the breakup of his relationship with a girlfriend, broke into the home of the woman's new boyfriend. Intoxicated and armed with a handgun, he fired several rounds throughout the home, and shot up two vehicles outside it. Fortunately, no one was present at the time. Conrady later pled guilty to six felony charges and received a deferred sentence. The OBA initiated disciplinary proceedings. After considering the evidence presented to the Professional Responsibility Tribunal, this Court suspended Conrady from the practice of law for two years and one day. We noted that while no one was injured in the shooting, Conrady's reckless behavior could easily have resulted in death or serious injury. , ¶ 10, 275 P.3d at 137.
¶10 Here, while Silvernail may subjectively have believed he was justified in his actions to protect Anderson and/or himself, the trial court and jury found his actions objectively unreasonable. In short, Silvernail brought a gun -- a chamber-loaded gun, no less -- to what had been a verbal disagreement. He pointed the gun in a threatening manner, and fired it when DeJesus reacted to having the gun pointed at him. At trial, a physician testified that because the bullet hit an artery, DeJesus was lucky to have survived.
¶11 Given the light sentence it recommended, Silvernail's jury apparently found that the circumstances mitigated his culpability to some extent. It nevertheless found him guilty as charged of a violent felony. Our task here is to consider how Silvernail's judgment on the night in question reflects on his fitness to practice law. We agree with the trial court's comment at Silvernail's formal sentencing:
You, your attorneys, the DAs, me, any other lawyer in this room are held to a higher standard. We are expected, and perhaps required, to have the ability to think and reason before we react. That's part of our job.
¶12 Silvernail maintains that he believed a woman was in danger when he shot DeJesus -- specifically, that her inebriated condition increased the chance that she might be sexually assaulted. But again, there was no evidence that the woman was in imminent danger of the sort that would have justified the use of deadly force. There were several alternative courses of action open to Silvernail, such as summoning the bar's security, calling the police, or taking down the vehicle tag number of the vehicle DeJesus was traveling in. In fact, there was testimony that Silvernail at one point planned to follow the vehicle DeJesus was riding in and join the proposed "after-party." In any event, Silvernail's choice to deliberately bring a chamber-loaded firearm into the situation was an extremely poor choice, one that could easily have led to a homicide. We find clear and convincing evidence that Silvernail's conduct adversely reflects on his judgment, and consequently, on his fitness to practice law. Conrady, , ¶ 10, 275 P.3d at 137.
B. Silvernail's post-trial attempts to maintain his law practice.
¶13 While in jail awaiting formal sentencing, Silvernail made a number of phone calls to his mother, daughter, and brother concerning his law practice. These family members are not attorneys, although Silvernail's daughter had apparently served as his office manager. The conversations generally involved monitoring Silvernail's open cases, managing the firm's accounts, and arranging for fellow attorneys to stand in for Silvernail and seek continuances on pending matters. In one call, Silvernail estimated that he had 60 to 70 active cases. In another, Silvernail told his mother to deposit any checks received from clients directly into his operating account, rather than his client trust account.
¶14 As these conversations make clear, Silvernail thought he could continue to represent existing clients while he remained in jail. In fact, he believed he could take on new clients as well. Silvernail thought that so long as he could find attorneys to stand in for him at hearings, he could operate his practice vicariously, as a sort of general manager. At the same time, Silvernail expressed more concern with justifying the receipt and retention of client funds, rather than effectively representing the clients themselves. He even expressed strong reluctance at giving the stand-in attorneys access to client files: "If I give that file to [another lawyer], why is somebody going to pay me?" When discussing the possibility of taking on new clients, Silvernail reasoned that once the client agreed to pay his firm, "I can send any practicing attorney to any court case."
¶15 Silvernail seems to have thought that he might receive a suspended sentence instead of prison time. At the very least, he believed he could keep his practice open until he was formally sentenced. He discussed the possibility that his sentencing might be continued, which would give him additional time to continue practicing law. In one conversation he said, "As long as somebody shows up [for] each one of my clients then I'm still practicing law while I'm in jail so that's wonderful."
¶16 The OBA claims that Silvernail's attempts to maintain his practice from jail violated the Oklahoma Rules of Professional Conduct, specifically Rule 1.1 (a lawyer shall provide competent representation); Rule 1.3 (a lawyer shall act with reasonable diligence in representing a client); and Rule 1.7(a)(2) (a lawyer shall not represent a client if doing so creates a conflict of interest, i.e. "[a] significant risk that the representation ... will be materially limited by [the] personal interest of the lawyer"). The OBA also claims that Silvernail's discussion of client matters with (non-lawyer) members of his family, over an unsecure jail phone line, violated Rule 1.1 (basic competence in representation) and Rule 1.6 (a lawyer "shall not reveal information relating to the representation of a client" without the client's informed consent). The OBA further asserts that Silvernail's blanket instruction not to deposit client checks into his trust account violated Rule 1.15(c) (requiring that client funds be deposited into a trust account if they have not yet been earned). Finally, the OBA claims that Silvernail's use of stand-in lawyers with various personal issues violated Rules 8.4(a) and (d), which declare that it is professional misconduct for a lawyer to violate any provision of the RPC, or "engage in conduct that is prejudicial to the administration of justice."
¶17 We begin with the last three of these allegations. First, while Silvernail was clearly discussing details of his law practice on a phone monitored by jail officials, the OBA does not point to any confidential, client-specific information that was revealed. Second, while the OBA focuses on the fact that Silvernail instructed his mother not to deposit any funds in his client trust account, that fact is only relevant if Silvernail did indeed receive funds that had not yet been earned. Rule 1.15(c), RPC ("A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred") (emphasis added). It is not clear from the record that Silvernail received any funds at all from clients during the time frame at issue, much less funds for work yet to be done. Third, the record does not support a finding that the attorneys Silvernail sought as stand-ins were incompetent to handle the tasks given to them, or that they would have violated any ethical rule merely by seeking continuances on Silvernail's pending cases.
¶18 Nevertheless, when Silvernail's conduct while awaiting sentencing is viewed as a whole, it is clear that he was not acting in his clients' best interests, and that he placed his own financial motives first. The obstacles to effective representation from a jail cell should be obvious. As an inmate, Silvernail was unable to confer with clients confidentially. He was unable to communicate freely with prosecutors or other opposing counsel about his clients' cases. He was obviously unable to appear in court on his clients' behalf. His ability to access legal resources, a computer, or even his own clients' files, was hampered to say the least. Finally, practicing law from a jail cell arguably gives the appearance of impropriety. These conditions would have prompted a reasonable attorney to take a different tack.

¶19 In fact, as the OBA points out, the possibility that Silvernail could be taken into custody -- severely curtailing his ability to serve his clients -- arose as early as June 2016, when criminal charges against him were initially filed. And yet, for more than three years, Silvernail apparently took no steps to prepare for that contingency. Before the Tribunal, Silvernail's brother, who had no experience in law office management, testified to the confusion in trying to take control of the practice with no advance notice. And again, from Silvernail's jail conversations, it is clear that he was seeking continuances for his own benefit, not his clients'. He did not even want his stand-in attorneys to have access to his clients' files, for fear that he would lose income.
¶20 Silvernail has stipulated that the OBA's allegation of a conflict of interest was proven by clear and convincing evidence. Still, he maintains he acted in good faith to take care of his clients' outstanding matters. We cannot agree. While there may be no evidence of malfeasance with regard to any particular client, Silvernail placed himself in a situation where he was necessarily unable to provide prompt and competent representation to any of his clients -- and he had plenty of time to avoid that outcome. Rules 1.1, 1.3, RPC. Silvernail's failure to close his practice earlier shows that he was more interested in cash flow than client care. At the very least, Silvernail's attempts to maintain his law practice from jail violated his ethical duty to provide prompt, competent, and conflict-free representation to his clients. Rule 1.7(a)(2), RPC.
C. Whether disciplinary action is warranted.

¶21 Having found that Silvernail engaged in professional misconduct, we now consider appropriate discipline. The goal in these proceedings is not to punish the attorney, but to protect the public and preserve the integrity of the bar. Conrady, , ¶ 16, 275 P.3d at 139. We have identified four components to attorney discipline: (1) safeguarding the public interest; (2) preserving public confidence in the judiciary; (3) promoting the integrity of the judicial system; and (4) deterring similar misconduct. State ex rel. OBA v. McArthur, , ¶ 6, , 1098.
¶22 We first consider mitigating evidence presented on Silvernail's behalf before the Tribunal. Silvernail clearly cooperated with the OBA's investigation. When the OBA sought emergency interim suspension due to Silvernail's attempts to maintain his practice from jail, Silvernail promptly wound up his practice. He did not appeal his felony conviction. The Tribunal received testimony about Silvernail's general character and competence as a lawyer from Silvernail's brother, Silvernail himself, and from an attorney who had known Silvernail for many years. Silvernail himself expressed remorse for the fact that DeJesus lost his leg, but maintains that he acted responsibly.
¶23 We turn again to Conrady, since it is one of the few disciplinary cases where we have dealt with violent criminal conduct. In Conrady we found the lawyer's actions -- a domestic incident where he broke into a home and fired several gunshots -- were sufficient to warrant disbarment. The Professional Responsibility Tribunal recommended suspension of two years and one day in that case, and the OBA endorsed that recommendation. Conrady, , ¶ 17, 275 P.3d at 139. Although no one was physically harmed by Conrady's actions, the experience clearly frightened those who were the targets of his ire. The conduct also brought embarrassment and discredit to the legal profession. Id. at ¶ 18, 275 P.3d at 139-140. We considered mitigating evidence showing that Conrady had no prior disciplinary actions; that several witnesses testified to his general fitness as a lawyer; and that he showed remorse and was making efforts to conquer his substance abuse. Id. at ¶¶ 14-15, 275 P.3d at 139. Considering all of the circumstances, we concluded that suspension for two years and one day, rather than disbarment, was warranted. Id. at ¶ 19, 275 P.3d at 140.
¶24 Conrady involved a lawyer committing violent acts that were "reckless and potentially deadly". Id. at ¶ 18, 275 P.3d at 139 (emphasis in original). In the present case, Silvernail's conduct was not only reckless; it actually did cause physical injury, and could easily have been fatal. DeJesus spent over a month in the hospital, and underwent more than a dozen surgeries. A physician testified that, considering the location of the wound, DeJesus was lucky to be alive. He was permanently maimed in any event.
¶25 The circumstances leading up to the violent conduct in this case are also considerably different from those in Conrady. Conrady was distraught over the abrupt end to an intimate relationship. This in no way justified his conduct, but it at least provided an explanation for behavior that was out of character for him. The same cannot be said here. Silvernail's motives in this case may not have been malicious, but they were certainly officious: marked with an over-eager desire to inject himself into the situation. The fact that Silvernail so readily resorted to bringing a chamber-loaded pistol with him, and other evidence in the record, raise concerns about Silvernail's judgment. There is a real possibility that Silvernail could find himself in similar situations in the future, bringing further discredit to himself and the Bar.
¶26 We have found disbarment an appropriate sanction in a variety of situations, usually involving a combination of client neglect, misappropriation of funds or similar dishonest action, and general refusal to cooperate with the OBA and this Court. Other jurisdictions have found disbarment was warranted in circumstances similar to those presented here. For example, in Matter of Collins, 429 S.E.2d 908 (Ga. 1993), the Supreme Court of Georgia summarily found disbarment to be appropriate for a lawyer convicted of aggravated assault. In Matter of McGrath, 655 P.2d 232 (Wash. 1982), lawyer McGrath got into a verbal altercation with another patron at a restaurant bar. A short time later, the two men resumed their argument, and the other man slapped McGrath. McGrath left the restaurant, but was confronted again outside. McGrath claimed that he shot the man in the neck after his demands to back away went unheeded. The man was seriously injured, and McGrath pled guilty to felony assault and received a ten-year suspended sentence. Id. at 233.

¶27 The Washington Supreme Court found McGrath's conduct sufficient to warrant disbarment. The court found that the use of unjustified violence against another person demonstrated the "moral turpitude" that affects one's fitness to practice law. Id. at 234. "[W]hile McGrath was licensed to carry a weapon, his carrying of a loaded pistol on many occasions and in situations where he had consumed considerable alcohol is not in keeping with the prevailing standard of right conduct." Id. In concluding that disbarment was in order, the court considered not only the seriousness of McGrath's offense and strong possibility of repetition, but also how his conduct reflected on the legal profession in general. Id. at 235-36.
¶28 In In re Brown, 674 So.2d 243 (La. 1996), the Louisiana Supreme Court ordered disbarment for an attorney who pled guilty to negligent homicide. Brown fatally shot her domestic partner, Gills, after an argument. She told police that earlier in the evening, the couple had visited a bar, and that Gills accused her of flirting with others. When they returned home, the argument continued. Brown said she retreated to her bedroom and locked the door, but when Gills began beating on the door, Brown let her in. Brown admitted that Gills was not threatening her in any way. Nevertheless, Brown retrieved a gun from under the bed and, according to her account, "it went off." Id. at 246.
¶29 The Louisiana Supreme Court found that Brown's intentional resort to a firearm in that situation reflected materially on her judgment, and hence on her fitness to practice law. "When a gun is drawn against another person, intoxicated or not, the risk that someone could be seriously injured or killed is always present." Id. at 245. "[Brown] demonstrated a violent reaction to an admittedly non-threatening situation. Her response to this apparently stressful situation creates concern regarding her continued ability to represent clients given the pressures associated with the practice of law." Id. at 249.
¶30 The fact that Silvernail was so quick to bring a chamber-loaded firearm into the circumstances here, gives us grave concerns about his fitness to practice law. We also are concerned about how allowing Silvernail to continue to practice would reflect on the Oklahoma Bar. The fact that a person charged with a crime happens to be an attorney is never lost in a news story -- and usually finds its way into the headline. As we observed in State ex rel. OBA v. Hayes, , ¶ 14, , 1004, "[a]n attorney involved in a public altercation will undoubtedly be interpreted negatively towards the legal profession" (emphasis in original). Silvernail's conduct in jail pending sentencing also evinced a lack of good judgment, giving new meaning to the term "jailhouse lawyer," and further embarrassing the Bar in the process.
¶31 Both parties are content with the Tribunal's recommendation that Silvernail be suspended from the practice of law for two years and one day. We disagree. Silvernail resorted to deadly force in circumstances that did not justify such a response. He then placed his own financial interests above the interests of his clients, by trying to keep his practice on life support while he awaited sentencing. We believe Silvernail's behavior demonstrates his inability to provide the kind of judgment expected of a lawyer.
CONCLUSION
¶32 For the reasons given above, this Court finds that Silvernail should be disbarred. Pursuant to Rules 6.13 and 6.16, RGDP, the OBA has filed an application to assess costs in this matter against Silvernail in the amount of $2,934.86. The OBA's application is granted.
RESPONDENT IS DISBARRED
AND ORDERED TO PAY COSTS OF $2,934.86.
ALL JUSTICES CONCUR.
FOOTNOTES
 Silvernail is also presently suspended from the practice of law in Oklahoma for failing to keep current on his dues and continuing-education requirements. SCBD Nos. 6971, 7058.
 The trial testimony indicated that one of Anderson's companions asked Silvernail to "go get his friend," which he understood as a request to get his firearm out of his vehicle.
 At trial, Silvernail admitted suggesting this plan, but claimed it was a ruse -- that he had no intention of following through with it. But for our purposes here, the fact that the plan was even agreed to by DeJesus undermines Silvernail's belief that the woman was in danger.
 Calls are routinely monitored and recorded by jail officials. The recordings at issue here were offered into evidence before the Tribunal and are included in the record before us.
 In his brief, Silvernail alleges that he "did not collect any payments from clients during his incarcerated period." At the Tribunal, Silvernail's brother testified that "there wasn't even a penny that came in" during this time.
 The OBA made much of Silvernail's disparaging nicknames for these attorneys. The OBA does not claim any of these lawyers were in fact incompetent. In our view, the more important concern is whether Silvernail had his clients' best interests at heart by enlisting, at the last minute, lawyers he did not appear to trust.
 Silvernail's brother said he and others spent "hundreds of hours" trying to gather all contact information for all of Silvernail's clients. "[W]e actually called every county, asked them for the list of their criminal judges, and called each one to see if Jay had anybody on their docket ... it was a difficult situation for people that don't know what they're doing." The witness also stated that Silvernail "had every loose end you could have because he didn't expect to be taken to county jail back at [the conclusion of] the trial."
 "To prevent neglect of client matters in the event of a sole practitioner's death or disability, the duty of diligence may require that each sole practitioner prepare a plan, in conformity with applicable rules, that designates another competent lawyer to review client files, notify each client of the lawyer's death or disability, and determine whether there is a need for immediate protective action." Rule 1.3, RPC, cmt. 5.
 "Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." Rule 1.7, cmt. 8.
 About a year before he shot DeJesus, Silvernail shot and killed another man. The incident apparently was not mentioned at Silvernail's criminal trial, but it was raised before the Tribunal. Silvernail fatally shot a client, a convicted felon, outside Silvernail's home in 2015. There appear to have been no witnesses. Silvernail claimed he acted in self-defense; no charges were ever filed. We agree with the OBA that two shooting incidents so close in time to each other is, at the very least, "concerning." The fact that someone in trouble is an attorney adds spice to a news story, as well as further embarrassment to the profession. One of the OBA's exhibits before the Tribunal was a local newspaper article related to this case entitled, "Alleged shooter at bar is attorney who shot & killed client in self-defense."
 See e.g. State ex rel. OBA v. Willis, , 504 P.3d 1141 (attorney disbarred for several instances of client neglect, misuse of client funds, a federal firearms offense, and complete failure to respond in the disciplinary investigation); State ex rel. OBA v. Rowe, , (attorney failed to keep clients reasonably informed, commingled client funds, refused to refund unearned retainers and client files, did not sufficiently respond to grievances, failed to respond to OBA's demands for information); State ex rel. OBA v. Passmore, , (attorney avoided contact with clients and failed to respond to their grievances, failed to appear at a deposition and the PRT hearing, and refused to return client files); State ex rel. OBA v. Sweet, , (attorney pled guilty to felonies involving dishonesty and breach of trust, failed to comply with continuing education requirements, engaged in unauthorized practice of law, failed to respond to client grievances, neglected to respond to OBA's complaint, and disregarded this Court's orders).
 The version of events came from McGrath's own affidavit.
 E.g., "Jury convicts attorney who claimed self-defense in shooting," retrieved from https://www.oklahoman.com/story/news/crime/2019/10/11/jury-convicts-attorney-who-claimed-self-defense-in-shooting/60429298007/