OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LANCE

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LANCE
2023 OK 98
Case Number: SCBD-7183 (Cons. w/ SCBD-7214)
Decided: 10/10/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2023 OK 98, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,
v.
LANCE T. LANCE, Respondent.

ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE

¶0 Complainant, the State of Oklahoma ex rel. Oklahoma Bar Association (OBA), brought disciplinary proceedings against Respondent based on (a) convictions in four separate criminal cases; (b) one judicial grievance and two client grievances filed against Respondent; (c) the unauthorized practice of law; and (d) other professional misconduct. For the reasons discussed below, we find clear and convincing evidence that Respondent's conduct requires disbarment. We order Respondent to pay costs of $9,252.87 within ninety days from the date of this Opinion.

RESPONDENT DISBARRED; APPLICATION FOR COSTS GRANTED

Katherine M. Ogden, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Gordon R. Melson, Ada, Oklahoma, for Respondent; Respondent, pro se.

KUEHN, J.:

¶1 This matter is before the Court for imposition of final discipline under combined Rules 6 and 7.2, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2023, Ch. 1, App. 1--A. Respondent Lance Timothy Lance was licensed to practice law in Oklahoma in 2000. A series of criminal and professional misconduct incidents involving Respondent began in January 2020 and culminated with his interim suspension in January 2022.

Murray County Criminal Cases

On October 28, 2021, Respondent pled no contest in four separate criminal cases in Murray County. In CM-2020-56, Driving While Under the Influence of Intoxicants, he received a one-year sentence, with all but 90 days suspended, and a fine. In CM-2020-192, Violation of Protective Order, he received five years in prison, all deferred except for 90 days in the Murray County Jail, and a fine. He was given the same sentence in CM-2021-206 (Count I) Possession of Methamphetamine, and (Count II) Unlawful possession of Drug Paraphernalia. He also received that sentence in CM-2021-224 (Count I) Possession of Methamphetamine, (Count II) Unlawful Possession of Paraphernalia, and (Count III) Obstructing an Officer.

¶2 On December 10, 2021, the OBA filed a Notice of Judgments and Sentences pursuant to Rule 7.2. On January 10, 2022, this Court imposed an interim suspension and directed Respondent to show cause, if any, why it should be set aside. Respondent and the OBA responded, and on February 28, 2022, this Court denied Respondent's motion to lift the interim suspension. The matter was referred to the Professional Responsibility Tribunal for a hearing for a recommendation of final discipline.

Professional Misconduct Complaint

¶3 On February 8, 2022, at the direction of the PRT, the OBA filed a formal complaint pursuant to Rule 6 against Respondent in this Court, alleging five counts of professional misconduct. The allegations involved failure to appear on clients' behalf, failure to communicate with clients, failure to complete work, failure to complete continuing legal education requirements, and the unauthorized practice of law while under suspension. Rules 1.3, 1.4, 1.15, 5.5, and 8.4(d) of the Oklahoma Rules of Professional Conduct, 5 O.S. ch. 1, app. 3-A; Rule 1.3 of the Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1, app. 1-A. The PRT recommended Respondent be suspended from the practice of law for two years and one day, and to pay the costs of these disciplinary proceedings.[1]

STANDARD OF REVIEW

¶4 This Court has exclusive original jurisdiction over bar disciplinary proceedings. State of Okla. ex rel. Okla. Bar Ass'n v. McBride, 2021 OK 61, ¶ 8, 500 P.3d 619, 622. The Bar must prove its allegations by clear and convincing evidence. State ex rel. Okla. Bar Ass'n v. Silvernail, 2022 OK 68, ¶ 3, 522 P.3d 464, 466. We review the evidence de novo. State ex rel. Okla. Bar Ass'n v. Conrady, 2012 OK 29, ¶ 6, 275 P.3d 133, 136. The Court's primary responsibility in these proceedings is the protection of the public and the preservation of the integrity of the courts and the legal profession. State ex rel. Okla. Bar Ass'n v. Willis, 2022 OK 15, ¶ 8, 504 P.3d 1141, 1146. While this Court considers the recommendations of the PRT, those recommendations are not binding. Conrady, 2012 OK 29, ¶ 6, 275 P.3d at 136.

CRIMINAL CHARGES (RULE 7)

¶5 Rule 7.1: A lawyer who has been convicted or has tendered a plea of guilty or nolo contendere pursuant to a deferred sentence plea agreement in any jurisdiction of a crime which demonstrates such lawyer's unfitness to practice law, regardless of whether the conviction resulted from a plea of guilty or nolo contendere or from a verdict after trial, shall be subject to discipline as herein provided, regardless of the pendency of an appeal.

Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1 app. 1-A.

¶6 Rule 7 applies where a lawyer has been convicted of a crime. Certified copies of the conviction, including guilty pleas, are conclusive evidence of commission of the crime and provide a sufficient basis for discipline. Rule 7.2, Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1 app. 1-A. Rule 7 provides for summary disciplinary proceedings, focused on whether the conviction demonstrates the lawyer's unfitness to practice, and what discipline should be imposed. McBride, 2021 OK 61, ¶ 9, 500 P.3d at 622. Unfitness to practice reflects on a lawyer's "honesty, trustworthiness or fitness as a lawyer in other respects", including "conduct involving dishonesty, fraud, deceit or misrepresentation." Rule 8.4(b), (c), Rules of Professional Conduct, 5 O.S. ch. 1, app. 3-A. These offenses involve "violence, dishonesty or breach of trust, or serious interference with the administration of justice." State ex rel. Okla. Bar Ass'n v. Armstrong, 1990 OK 9, ¶ 8, 791 P.2d 815, 818; Comment to Rule 8.4, Rules of Professional Conduct, 5 O.S. ch. 1, app. 3-A.

¶7 Respondent claims, and witnesses agree, that he practiced law for more than twenty years without incident. However, by 2019, Respondent was the subject of several interactions with police, including welfare checks, domestic and property disputes, and traffic stops. Most witnesses who knew Respondent testified to his deterioration and believed it was due at least in part to his drug use. In late 2019, Respondent's assistant prepared and delivered case paperwork to Respondent's house because he stopped coming to his office; he also asked her to bring a gun to keep in the office. On one occasion Associate District Judge Duck contacted the assistant after Respondent missed a court appearance and had her bring that paperwork and all Respondent's deprived child cases to him. Eventually, Judge Duck told her to close Respondent's law office.

CM-2020-56 (Driving While Under the Influence of Intoxicants)

¶8 On February 29, 2020, Respondent was stopped for crossing double yellow lines, expired tag, and apparently arguing with a passenger. The officer observed that Respondent had erratic behavior, was agitated and appeared paranoid; the officer suspected Respondent was under the influence of an intoxicant. Respondent first suggested to the traffic officer that "there are certain people that you do not arrest", then failed field sobriety tests.

CM-2020-192 (Violating a Protective Order)

¶9 Respondent's former partner, G.S., obtained a permanent protective order directing Respondent to (a) stay away from G.S. and her children, and (b) to surrender his firearms and dangerous weapons. While out on bond for the DUI, Respondent tried to communicate with G.S. and was charged with a violation of permanent protective order on June 26, 2020. He failed to appear, forfeited his bond, was arrested, and was released on July 8 to undergo inpatient treatment for addiction. After treatment concluded, he was released upon a payment of $25,000. The protective order was dismissed during the pendency of this case, on April 8, 2022.

CM-2021-206 (Possession of Methamphetamine and Paraphernalia)

¶10 On July 21, 2021, during a traffic stop, Respondent's passenger had an active warrant, and drugs on his person. Ultimately this led to a search of Respondent's car. The officer found loose pills as well as glass pipes and a baggie with methamphetamine residue in Respondent's console and his bag. He was charged with possession of methamphetamine and unlawful possession of paraphernalia, posted bond, and was released.

CM-2021-224 (Possession of Methamphetamine, Possession of Paraphernalia, Obstructing an Officer)

¶11 On July 28, 2021, Sulphur police were called to Respondent's home for a welfare check. Events resulting from that check are discussed later in this Opinion, in connection with a Rule 6 allegation. However, officers eventually executed a search warrant and entered the house by breaking a window. The next day, on July 29, Respondent's mother asked his friend Foltz to check on Respondent. Foltz went to the house but could not reach Respondent. Foltz entered through the window police had broken the previous day, and Respondent repeatedly hit him with a baseball bat. Foltz went to the hospital and Respondent called police to report a burglary in progress.[2] Officers arrived, found no burglary, and went to the hospital to interview Foltz. Respondent was arrested because of Foltz's injuries; in the search incident to arrest police found methamphetamine and pipes with methamphetamine residue. Respondent was charged with possession of both methamphetamine and paraphernalia, and obstructing an officer.[3]

¶12 Respondent pled guilty in each misdemeanor case. Respondent received a cumulative sentence of 90 days in jail and five years in prison deferred, plus one year suspended, all running concurrently to one another, along with fines.

Discussion

¶13 Several of Respondent's convictions, for driving under the influence, methamphetamine possession, and possession of paraphernalia, arguably stem from his admitted methamphetamine addiction. However, his conviction in CM-2020-192, for violation of a protective order, was based on his violation of a court order. This and his subsequent crimes were committed while he was out on bond for the February 2020 DUI, and each successive case. His conviction for obstruction of justice in CM-2021-224 involves deceit. This, and the violation of the court order, are particularly troubling. As we recently discussed, we have "repeatedly disbarred attorneys following convictions for crimes involving dishonest conduct." State ex rel. Okla. Bar Ass'n v. Pistotnik, 2020 OK 93, ¶ 17, 477 P.3d 376, 381.

¶14 Taken together, these convictions form a pattern of repeated criminal offenses and show that Respondent is unfit to practice law. State ex rel. Okla. Bar Ass'n v. Hart, 2014 OK 96, ¶ 12, 339 P.3d 895, 899. Conduct not directly related to the practice of law may nonetheless show a lawyer is unfit to practice. Silvernail, 2022 OK 68, ¶ 5, 522 P.3d at 467 (assault and battery with deadly weapon). See, e.g., State ex rel. Okla. Bar Ass'n v. Bernhardt, 2014 OK 20, ¶ 20, 323 P.3d 222, 226 (guilty pleas to repeated alcohol-related charges); Conrady, 2012 OK 29, ¶ 10, 275 P.3d at 137 (while drunk, Conrady broke into a house and fired numerous shots, then shot at two cars on the property); State ex rel. Okla. Bar Ass'n v. Garrett, 2005 OK 91, ¶ 13, 127 P.3d 600, 605 (Rule 6 proceeding, sexual battery against non-clients).

PROFESSIONAL MISCONDUCT (RULE 6)

¶15 Rule 6 sets forth the process by which the OBA processes grievances against attorneys, conducts investigation, and presents the results and recommendations to this Court for disciplinary action. Based on the evidence presented at the hearing, the PRT found Respondent violated Rules 1.3, 1.4, 1.15, 5.5, and 8.4(d) of the Oklahoma Rules of Professional Conduct, 5 O.S. ch. 1, app. 3-A, as well as Rule 1.3 of the Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1, app. 1-A. Attorneys must act with reasonable diligence and promptness (Rule 1.3), maintain reasonable communications with clients (Rule 1.4), and hold the property of clients and third parties separately for safekeeping (Rule 1.15). Attorneys must not engage in the unauthorized practice of law, including practicing while suspended (Rule 5.5). Finally, lawyers may not engage in conduct prejudicial to the administration of justice (Rule 8.4(d)).

Count I -- Judge Duck Grievance

¶16 From late 2020 through early 2021, Associate District Judge Duck of Murray County District Court observed that Respondent failed to appear for court dates in five separate cases, without notice to either the court or his clients.[4] Respondent's clients each told Judge Duck that they had tried to contact Respondent but could not do so; because he was still the attorney of record, they were unable to use different counsel. Judge Duck reported each failure to appear to the OBA with notice to Respondent. Judge Duck testified at the PRT hearing that Respondent told him at the time that he was dealing with some mental health issues, and the judge believed these were exacerbated by methamphetamine. In each instance, Respondent neglected his clients and failed to communicate with them in violation of Rules 1.3 and 1.4.

Count II -- McElroy Grievance

¶17 McElroy paid Respondent $2250 in September 2020, to prevent her son from taking her home. Her nephew, Currie, had her power of attorney and worked with her. Neither McElroy nor Currie were able to contact Respondent about the case. At his office, they found other clients' notes taped to the door. The two went to the courthouse in December 2020 and discovered a hearing was set for February 2021. They could not reach Respondent, who failed to appear for the hearing. He was removed from the case, and McElroy had to hire new counsel. Respondent did not provide an accounting of funds until required to do so by the OBA immediately before his disciplinary hearing; McElroy disputed its accuracy during the hearing, insisting that Respondent had not done the work she paid him for; she rejected Respondent's suggestion that she had also asked him to do other estate work at the same time. Respondent attempted to deflect responsibility by suggesting that McElroy had been ill and not thinking clearly when she hired him. McElroy flatly denied the allegation. Respondent's repeated failures to communicate or meet with the client, and failure to appear to represent her in court, violated Rules 1.3 and 1.4.

Count III -- Murray Grievance

¶18 James Murray, who was in prison in Texas, hired Respondent in April 2021 to assist him with requirements necessary for release under the prison's pre-release program -- creating an outside contact and getting a place to live. Murray went to Respondent because Murray's mother had recently died, and he was friends with Respondent's family. Murray sent Respondent a cashier's check from his mother's estate, birth certificate, state and tribal identification, and his Social Security card for safekeeping. Respondent rented an apartment for Murray. However, before release, Murray's probation officer had to verify the housing requirement. The officer could not reach Respondent, who failed to return phone calls or messages, and Murray's release was significantly delayed. Murray tried to reach Respondent for an explanation of the denial by phone and email, and had others call on his behalf, but never heard from Respondent. Murray also demanded his property back, but Respondent did not return the property until after this grievance was filed. At the hearing, Murray was shown a series of emails and letters in which Respondent suggested that Murray withdraw the grievance, but Murray did not want to do that. Respondent's failure to communicate -- which ultimately caused Murray to spend several extra months in prison -- and failure to timely return Murray's money and identification violated Rules 1.3, 1.4, and 1.15.

Count IV -- General Counsel Grievance (Unauthorized Practice of Law)

¶19 Respondent failed to complete the 2020 Mandatory Continuing Legal Education (MCLE) requirements and was so notified in January 2021. On March 15, 2021, the OBA MCLE administrator sent Respondent a certified show cause letter, stating that he was not in compliance with MCLE requirements and, if he did not remedy this by May 14, 2021, his license to practice law would be suspended. The OBA sent Respondent emails to this effect in February, March, April, and May 2021, and made several unsuccessful attempts to reach him by phone. Respondent did not make up his deficient MCLE requirements, and this Court suspended his law license on June 7, 2021.

¶20 On June 9, 2021, Respondent appeared in Murray County District Court and executed a waiver on behalf of a client. He testified at his PRT hearing that he knew he hadn't completed his MCLE credits but had forgotten about it when he was in court. He admitted he should not have represented the client; however, he argued that he was neither her attorney of record nor formally entered the case.

¶21 On September 10, 2021, Respondent was in jail after his arrest in CM-2021-224 (for drug possession, obstructing an officer, and assault and battery), and his license was still suspended for failure to comply with MCLE requirements. From jail, he filed a motion for continuance in Murray County District Court on behalf of a client, signing the motion with his OBA number and the notation "attorney for ?" (? is often used for "defendant"). The district court overruled the motion, noting that Respondent's license was suspended, and he could not represent the client.

¶22 On October 12, 2021, a handwritten motion to dismiss was filed in Respondent's case, CM-2020-192 (violation of protective order), signed by Respondent with his OBA number and the notation "Attorney for Defendant". Respondent's license was still suspended at this time. Respondent admitted signing the document but said he didn't remember it because he had filed several motions from jail in the same period. In each of these incidents Respondent engaged in the unauthorized practice of law and violated Rule 5.5.

Count V: The Spring Gun/Personal Behavior

¶23 On July 21, 2021, Respondent was arrested for possession of methamphetamine and paraphernalia (CM-2021-206, above) and bonded out. On July 28, Judge Duck called police to perform a welfare check on Respondent. In response, officers Conyers and Calabrese went to Respondent's house, as they had done in the past to perform other welfare checks. They found two sheriff's deputies, Flowers and Eddy, already there. Respondent's friend Foltz arrived, and officers asked him to wait for them down the road, away from the house. Most of the doors were barricaded. From previous visits, officers knew there was an interior garage door that led into the house. They went into the garage and saw a string hanging from the doorknob that led up, over the door, and back into the house. Deputies touched the string but did not open the door. Flowers talked to Foltz, asking where Respondent was and why there was a string around the door. Foltz became upset and said he'd forgotten, but the string was a booby trap, attached to the trigger of a shotgun inside the house that was pointed at the doorway. Officers secured the house, left, and returned with a search warrant. Afraid that any nonbarricaded doors would have similar traps, they broke the front window and found the loaded shotgun, set up to fire at anyone coming through the interior garage door. Under the terms of the protective order then in effect, Respondent had been ordered to give up any guns he possessed.[5] The officers testified that preparation of this lethal booby trap posed a danger to them as they tried to carry out the welfare check, and its discovery adversely affected two officers' mental health. Respondent was neither arrested nor charged because of this incident. When asked about it during his PRT hearing, he first said he did not wish to discuss the circumstances leading up to it, then stated he did not want to open himself to potential criminal liability and invoked his Fifth Amendment right not to answer questions.

¶24 Respondent argues that because this incident did not result in arrest or criminal charges it is irrelevant to both the Bar's claims of professional misconduct, and to his fitness or ability to practice law. Respondent misunderstands the scope of disciplinary proceedings. We turn to Rule 1.3:

"The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

Rule 1.3, Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1 app. 1-A. Our de novo review of the record encompasses "all relevant facts." State ex rel. Okla. Bar Ass'n v. Littlefield, 2023 OK 53, ¶ 4, 529 P.3d 185, 188. Furthermore, "[f]itness to practice law entails more than the ability to handle cases but involves the continuing qualification of good moral character and respect for the law." Id. at ¶ 7, 529 P.3d at 188.

¶25 Evidence showed that at the time of the incident Respondent was mentally unstable and had been habitually using methamphetamine, was paranoid, had several pending criminal charges, and was prohibited from owning firearms. Respondent knew that officers had made frequent welfare checks at his house in the previous months, and that they were aware of the interior garage door. Evidence showed Respondent owned and lived in the home alone at the time of this incident. Respondent left his house locked and barricaded, with a loaded shotgun set to discharge when an unblocked interior door was opened -- potentially injuring any person who opened the door, and specifically endangering the officers who were at the house on official business. At best, this casts significant doubt on Respondent's good judgment; at worst, it shows a catastrophic failure of his ability to conform to social norms. Either way, this incident brings disrepute to the legal profession and reflect adversely on his fitness to practice law. Bar disciplinary proceedings are wholly separate from any criminal investigation. Whether Respondent was subjected to criminal charges is not our concern. We consider whether this conduct warrants discipline to protect the public and preserve the integrity of the profession. Silvernail, 2022 OK 68, ¶ 21, 522 P.3d at 470. Respondent's conduct violated Rule 1.3, as well as Rule 8.4(b), as it reflects adversely on his honesty, trustworthiness, or fitness to practice law. Rule 8.4(b), Oklahoma Rules of Professional Conduct, 5 O.S. ch. 1, app. 3-A.

EVIDENCE IN AGGRAVATION

¶26 The OBA directs us to several episodes described in the record but not charged separately. Officer Calabrese testified that he was often called to Respondent's house and stated that during one interaction Respondent had a syringe and methamphetamine. On cross-examination, Respondent elicited from Officer Newport that she had stopped him a few days before his February 2020 DUI arrest, had a friend take the wheel because Respondent was too impaired to drive, but neither arrested Respondent nor reported the stop. Respondent himself testified, in what he described as aggravation, that in a different incident Officer Newsome stopped him in March of 2021, and he did not have a valid driver's license.

Modification of deferred sentences

¶27 On March 11, 2022, after he had been suspended from the practice of law by this Court based on the Rule 7 allegations, Respondent filed a motion in Murray County District Court to have his deferred sentences reduced in each of his criminal cases. He specifically stated that he wished to modify "the charges he pled, as well as the deferral period, for employment purposes with the Oklahoma Bar Association." He complained that the charges, number and type of crimes, and the length of the deferred sentences all affected his "ability to gain employment as an attorney and to have his license reinstated." He stated in the Motion that the OBA sought to suspend his law license for two years based on the "current charges", that the OBA indicated it viewed "the obstruction charges" as involving deceit, and that the number of charges showed a pattern of offenses which indicated an indifference to his legal obligations.

¶28 An assistant district attorney agreed, and on June 14, 2022, the trial court modified Respondent's five-year deferred sentences to one-year deferred sentences in CM-2020-192, CM-2021-206, and Counts I and II of CM-2021-224. These modifications were based on Title 22 Section 982a, which authorizes a trial court to modify a sentence and impose a different sentence at any time within sixty months after the sentence is initially imposed; however, the trial court "shall not impose a deferred sentence." 22 O.S. § 982a(1). Under the plain language of this statute, it does not appear that modification to deferred sentences was appropriate. Also, imposition of a deferred sentence initially meant that Respondent had not yet actually been sentenced; Section 982a would not apply because it only authorizes a trial court to modify a sentence which has already been imposed. In addition, Count III of CM-2021-224, obstructing a police officer, was modified from a deferred sentence upon a plea of guilty to a deferred prosecution agreement under Title 22 Section 305.1, and dismissed.[6]

¶29 After his interim suspension, to avoid the professional consequences of his convictions -- suspension and possible imposition of discipline -- Respondent manipulated the system. He clearly stated this intent in his Motion to Modify Sentences. Because the deferred sentences in CM-2020-192, CM-2021-206, and CM-2021-224 were modified to one year, Respondent moved to dismiss those cases after that year expired, on August 22, 2022. The cases were dismissed on December 21, 2022, to apply retroactively.

¶30 In his Brief in Chief to this Court, in anticipation of these dismissals, Respondent argued that, after the cases were dismissed, he would petition for their expungement and ask that they be sealed, so they would no longer be of public record and reflect negatively on him or the Bar. And on December 28, 2022, Respondent filed in this Court a pleading titled Suggestion to the Court Regarding Completion of Deferred Sentence. In it he notes that the three cases were dismissed. He implies that, because his criminal cases were dismissed, this should affect the seriousness with which this Court views his conduct and the decision on imposition of discipline.[7] Respondent has misunderstood the scope and intent of disciplinary proceedings. Our focus is on "the welfare of the public and the integrity of the bar", and thus on Respondent's own actual misconduct. State ex rel. Okla. Bar Ass'n v. Shanbour, 2008 OK 62, ¶ 8, 195 P.3d 31, 33. Respondent's determined and deliberate efforts to minimize his criminal responsibility and its consequences, and escape discipline, cast doubt on his honesty, truthfulness, good judgment, and fitness to practice law.

EVIDENCE IN MITIGATION

¶31 Respondent testified on his own behalf. He freely admitted that at the time he committed his crimes he was addicted to methamphetamine. The record shows Respondent has battled this addiction since at least 2009. While Respondent's license was suspended, he took a continuing education class in which he learned for the first time that substance abuse and drug addiction might be a self-medication strategy for people with underlying mental health issues. At that point he concluded that his longstanding methamphetamine addiction was his attempt to self-medicate his own mental health issues. After consulting his doctor, he realized that, once he was prescribed appropriate medications, he no longer wanted to use methamphetamine.

¶32 Respondent's family doctor, Dr. Tatom, confirmed that he examined Respondent during the year immediately preceding his PRT hearing and felt he had bipolar disorder. Tatom said that in the fall of 2021 he prescribed medication commonly used to treat that condition, and by his observation the medication was working. Previously, Respondent had been diagnosed with and treated for depression. Tatom testified that when he advised Respondent to consult a psychiatrist about appropriate medication for bipolar disorder, Respondent replied that he felt good at the time and was reluctant to change medications. However, during the time in which the PRT hearing occurred Respondent consulted a psychiatrist.[8]

¶33 From July through August of 2020, after his first DUI arrest but before he committed the last two charged offenses, Respondent completed an inpatient methamphetamine treatment program. However, Respondent's failures to appear outlined in the Rule 6 Grievance Count I, as well as the conduct in Counts II, III, IV, and V, and Respondent's arrests for methamphetamine possession, assault, and obstructing an officer in CM-2021-206 and in CM-2021-224, all occurred after this inpatient treatment. Respondent participated in individual counseling for several months in 2020 after release from the treatment plan, again before the conduct which forms the basis for the charges against him. Respondent's driver's license was reinstated in April 2021, before the crimes which formed the basis for his last two convictions were committed. Respondent admitted he had a relapse between August of 2020 and fall 2021, during which time the conduct supporting most of these grievances occurred.

¶34 Respondent presented meeting logs supporting his claim that he regularly attended support group meetings for substance abusers.[9] At the time of the PRT hearing, he stated he attended meetings every week and a half or two weeks. Respondent indicated he did not currently have a formal sponsor but had a friend he relied on who would serve in that capacity. He arranged to participate in Lawyers Helping Lawyers meetings in the future. Respondent testified that he had almost a year of sobriety from July 27, 2021, to the start of the hearing on June 30, 2022. He submitted drug tests from January 2022 through June 2022, and other drug tests from March 2021, clean except for prescription medications and marijuana (Respondent testified he has a medical marijuana card).[10] Respondent completed his delinquent MCLE requirements in November 2021.

¶35 Respondent had other difficulties. In 2018 he had back surgery, to fix injuries resulting from a car accident. The accident itself was traumatic and there was significant recovery time from the surgery. In 2019, at Thanksgiving, Respondent and his partner separated. He became severely depressed and believed this began the cycle of drug abuse that led to his convictions and the grievances against him. Overall, describing his condition during the time the crimes were committed, he said that given his mental health, his addiction, and personal circumstances, he "had essentially a nervous breakdown."

¶36 Respondent provided two other witnesses. A former client, Hunter, testified that he had hired Respondent in several cases, was satisfied with his work, and looked forward to hiring him again. Hunter testified that he was aware Respondent had some health issues during 2021-2022 but did not know he was addicted to methamphetamine. Hunter was also Respondent's landlord and testified that he talked to Respondent about Respondent's assistant when Respondent was behind on her compensation. Respondent also called Lancaster, who sponsored Respondent at a Narcotics Anonymous group in 2008 or 2009 for methamphetamine addiction. Respondent allowed the group to meet in his law office rent-free. Lancaster was aware that Respondent had relapsed more than once during his recovery, but had spoken with him in the nine months preceding the hearing and felt Respondent was doing well. Lancaster and his daughter, separately, were also Respondent's clients before 2011, when Lancaster moved to Texas.

¶37 Respondent also submitted more than seventy letters from former clients. He prepared this as a single form letter and mailed it to clients, asking them to fill in personal information and submit it on his behalf. He admitted that, though he worked with his uncle, an attorney, to ensure his clients' cases were transferred to other attorneys, he neither sent the clients certified letters announcing his suspension nor filed a notice with the Supreme Court that he had done so, and was thus not in compliance with Rule 9.1, Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1 app. 1-A.

¶38 Respondent claimed that the consequences of his criminal convictions should be considered in mitigation. He argued that the 92 days he spent in jail were themselves mitigation of his misconduct. He argued that his conviction for driving under the influence in CM-2020-52 was two years old and thus dated, and the fact that he received a suspended sentence in that case was mitigating. He noted that the State had reinstated his driver's license. And he argued that his deferred sentences were about to expire, and he expected the convictions to be expunged. He argued that the criminal fines and costs were mitigating factors because they were a financial hardship to him. He noted that several witnesses stated they thought he could be rehabilitated and successfully practice again, and he apologized for his actions.

DISCIPLINE

¶39 In imposing discipline, we consider prior decisions which involve similar misconduct, but as each situation involves different facts and circumstances, we proceed case by case. Pistotnik, 2020 OK 93, ¶ 13, 477 P.3d at 380-81. We apply four factors in determining the appropriate level of discipline: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; (d) the existence of aggravating or mitigating factors. Conrady, 2012 OK 29, ¶ 11, 275 P.3d at 137-38. These factors safeguard the public interest, preserve public confidence in the courts, promote the integrity of the judicial system, and deter similar misconduct. Silvernail, 2022 OK 68, ¶ 21, 522 P.3d at 470. When considering the appropriate discipline, we will look at the entirety of the record. State ex rel. Okla. Bar Ass'n v. Friesen, 2016 OK 109, ¶¶ 23-24, 384 P.3d 1129, 1137-38.

¶40 In the Rule 6 matter, we have found Respondent violated Rules 1.3, 1.4, 1.15, 5.5, and 8.4(d) of the Oklahoma Rules of Professional Conduct, 5 O.S. ch. 1, app. 3-A, and Rule 1.3 of the Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1, app. 1-A. In Count I, Respondent failed to appear in court in five cases, and failed to contact either the court or his clients. He was removed as counsel in three cases, ordered to return unused retainer fees in two, and ordered to appear or face sanctions in one. In Count II, Respondent failed to communicate with his client or her representative, failed to perform the work she hired him for, failed to refund unused fees or provide an accounting until immediately before the PRT hearing (and then to the PRT, not the client), and failed to appear for a scheduled hearing. In Count III, Respondent failed to communicate with his client, failed to perform the work the client hired him to do, and failed to timely return client's personal property upon request. Respondent argues that none of these clients were harmed because he, or his uncle, eventually helped them find new counsel and their matters were resolved. But that is not the only measure of harm. None of the people who testified for OBA believed they were unharmed or had been made whole. Judge Duck testified as to the distress and inconvenience suffered by the clients who relied on him to report Respondent's failures to appear. Each client's matter was significantly delayed, causing them worry and inconvenience. McElroy, the client in Count II, testified that she had to pay another attorney to do the work she'd already paid Respondent to do. Murray, the client in Count III, stayed in prison an extra six or seven months because of Respondent's failures to communicate. He also testified as to the psychological damage Respondent caused when he relied on Respondent at a vulnerable time. In Count IV, Respondent admitted he engaged in the unauthorized practice of law. The evidence presented for Count V shows Respondent set a booby trap with a loaded shotgun in his house, and it endangered officers conducting a welfare check on him. At the hearing Respondent did not contest this evidence, but relied on his Fifth Amendment right not to incriminate himself as to both that incident and whether he had acquired a firearm (the shotgun) after his firearms had been confiscated pursuant to a court order. Respondent's lack of comment in no way dissuades this Court from considering the severity of these two firearms matters.

¶41 We have also found Respondent violated Rule 7. He has four separate convictions with seven separate counts, including driving under the influence, possession of methamphetamine and paraphernalia, violation of a protective order, and obstructing an officer. We found that the latter two crimes reflect on Respondent's honesty, trustworthiness, and fitness to practice law. And the convictions as a whole show a pattern of criminal conduct which shows Respondent is unfit to practice.

¶42 We may consider emotional, psychological, or physical disabilities in mitigation; however, they will not wholly insulate an attorney from disciplinary measures. State ex rel. Okla. Bar Ass'n v. Nichols, 2021 OK 28, ¶ 26, 488 P.3d 734, 741. There was significant evidence that Respondent's bipolar disorder and methamphetamine addiction contributed to his professional misconduct. The PRT panel, relying on State ex rel. Okla. Bar. Ass'n v. Giger, 2003 OK 61, 72 P.3d 27, found such a strong causal relationship between the two that the majority recommended a suspension from practice of two years and a day. However, there are significant factual distinctions between this case and Giger. Giger had been previously disciplined for misconduct resulting from drug abuse, was allowed to practice under conditioned supervision, failed to meet the conditions, and further disciplinary proceedings were brought. Although the OBA brought several allegations, this Court found that only one violation was established -- failure to participate in the Lawyers Helping Lawyers program as ordered. It was this single violation, combined with Giger's history of lack of cooperation in disciplinary proceedings, that resulted in a suspension of two years and a day.

¶43 The facts here are distinctly different. In fact, Giger itself supports disbarment under these circumstances. "Respondent's misconduct justifies disbarment in this case, but we decline to impose the ultimate disciplinary measure where, as here, respondent's misconduct has not caused any injury to a client, to the public, or to the legal profession beyond that which naturally flows from his defiance of the court's order." Giger, 2003 OK 61, ¶ 40, 72 P.3d at 39-40. Here, Respondent's conduct injured several clients, the public (in the guise of officers who encountered a dangerous situation of his making while trying to help him), and the legal profession. As in Giger, Respondent's misconduct justified disbarment.

¶44 Respondent has had no prior discipline. He was cooperative throughout the proceedings. However, throughout the PRT proceedings, and in filings before this Court, Respondent attempted to minimize the seriousness of his conduct. Through his questions to witnesses and his own testimony in the PRT hearing, he suggested that the officers involved in his arrests had personal reasons motivating their actions and testimony against him -- bias, animus, conflicts of interest, and vague suggestions that they were protecting other persons who had wronged Respondent.[11] He suggested that because the OBA filed the Rule 6 grievances in Count I, the clients named there had their cases resolved and were not unhappy with his representation. Respondent repeatedly claimed that only two clients had grievances against him. He contradicted McElroy's flat denial that she had ever received an accounting of his time spent on her case and went to great lengths to suggest he had saved her potentially thousands of dollars and represented her effectively. He suggested that, when he was in jail, he would have transferred Fullerton's case had law enforcement helped him or handled the situation better. He suggested that Murray had sent, or at least agreed with, a letter stating that Respondent could have done a better job for him but that Murray did not want to seek further remedy -- which Murray also flatly denied in his testimony.

¶45 Respondent emphasizes his actions supporting his recovery from methamphetamine addiction and his treatment for mental illness. We do not minimize those achievements. However, upon closer view, they don't paint quite the picture Respondent suggests. We give Respondent credit for completing one inpatient treatment for addiction. However, after he relapsed and committed several crimes and acts of professional misconduct, he did not return to inpatient treatment. Nor, according to his exhibits and testimony, did he continue regular individual counseling after his relapse in late 2020. Compelled by a pending court case and these proceedings, Respondent submitted regular clean drug tests and attendance sheets for substance abuse support group meetings. But by the time of the PRT hearing, he attended meetings only every ten days to two weeks and did not have a personal sponsor. He didn't start attending meetings of Lawyers Helping Lawyers until after testimony had closed in the PRT hearing. In testimony and argument, Respondent indicated that he feels much better since he began taking medication for his bipolar disorder, and believes he is now ready to resume the practice of law. Respondent is clearly sincere in his intention to live a sober life. However, when the OBA relied on Giger to recommend that Respondent receive a sentence of two years and a day, it commented, "Complainant does not believe Respondent [Lance] has sufficient safeguards in place to protect him from relapse...." We agree.

¶46 We turn to the factors involved in assessing appropriate discipline. First, Respondent violated his duties to his clients and the courts to give representation with reasonable diligence and promptness (Rule 1.3); to maintain reasonable communications (Rule 1.4); and to hold the property of clients and third parties separately for safekeeping (Rule 1.15). Respondent engaged in the unauthorized practice of law (Rule 5.5). In violating a court order, obstructing an officer, and setting a trap with a firearm, Respondent engaged in conduct prejudicial to the administration of justice. Second, as we have discussed, Respondent's mental illness and methamphetamine addiction significantly affected his conduct. Third, due to Respondent's conduct clients were actively harmed, the public was harmed, and the integrity of the legal profession suffered. And fourth, Respondent presented mitigating evidence connected to his mental illness and addiction; the OBA presented significant evidence in aggravation; and Respondent's own attempts to manipulate the criminal justice system and disciplinary process are also factors in aggravation.

¶47 We consider discipline using both the Rule 7 convictions and our Rule 6 conclusions. Willis, 2022 OK 15, ¶ 26, 504 P.3d at 1152. Respondent, while stating he will accept any suspension this Court orders, states that he has remedied his difficulties and asks that his license be restored. The OBA recommends suspension for two years and a day. Considering the entirety of Respondent's actions, we find this is not appropriate. We have disbarred an attorney who engaged in violent conduct and placed his own interests above those of his clients. Silvernail, 2022 OK 68, ¶ 31, 522 P.3d at 472. Disbarment was justified where an attorney had a federal firearm conviction, had five client grievances, mishandled client funds, and failed to cooperate with OBA disciplinary proceedings. Willis, 2002 OK 15, ¶ 29, 504 P.3d at 1153. Respondent's misconduct combined substance abuse, violence, dishonesty, disregard for court orders, disregard for legal process, and disregard for the Bar's requirements. He engaged in both a pattern of criminal conduct and the unauthorized practice of law. While he has made steps towards a life of sobriety, this cannot overcome the harm he has done to the public and the profession. We find that Respondent should be disbarred.

CONCLUSION

¶48 Consistently throughout the Rule 6 and Rule 7 proceedings, Respondent has tried to minimize the nature of his actions, civil and criminal, and their consequences to both his clients and the profession. In his criminal proceedings as well as this disciplinary proceeding Respondent has used his status as a lawyer to argue for, and receive, special privileges. Time after time Murray County law enforcement gave Respondent lenient treatment in traffic stops and welfare checks, despite his erratic and occasionally violent actions. The Murray County District Attorney's office dismissed a felony charge, allowed Respondent to plead to deferred sentences, agreed to modify those sentences so they could be discharged while these disciplinary proceedings were pending, and then dismissed the cases to give Respondent a perceived advantage in these proceedings. Respondent has suggested to both the PRT and this Court that clients who complained about him, either to Judge Duck or the OBA, were neither unhappy nor harmed by his actions. He has refused to address the serious charge involving the shotgun in Count V, instead invoking the Fifth Amendment. While admitting he engaged in the unauthorized practice of law, he suggested the problem was really his failure to complete MCLE hours, not the unauthorized representation. He has consistently failed to show the good judgment we expect of a lawyer. Silvernail, 2022 OK 68, ¶ 31, 522 P.3d at 472.

COSTS

¶49 The OBA filed an application to assess costs of $9,252.87, pursuant to Rules 6.13 and 6.16, Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1, app. 1-A. Respondent challenges the amount. The bulk of the expense was for required transcripts for the pretrial conference and PRT hearing. We find the payment of costs appropriate. Respondent is ordered to pay the costs of this proceedings in the amount of $9,252.87 within ninety days from the date of this Opinion.

RESPONDENT IS DISBARRED
AND ORDERED TO PAY COSTS OF $9,252.87

CONCUR: Winchester, Edmondson, Combs, Darby and Kuehn, JJ.

CONCUR IN PART/DISSENT IN PART: Kauger, J.

DISSENT: Kane, C.J.

NOT PARTICIPATING: Rowe, V.C.J., and Gurich, J.

KAUGER, J., concurring in part/dissenting in part:

"I would adopt the recommendation of the Professional
Responsibility Tribunal of two years and one day."

KANE, C.J., dissenting:

"I would suspend Respondent for three years."

FOOTNOTES

[1] The lay member of the PRT panel recommended suspending Respondent for six months.

[2] Respondent admitted assaulting Foltz but denied that the actions constituted a crime. He also admitted calling in a burglary report after the assault. He stated he was neither under the influence nor suffering from a mental health crisis at the time of the assault but was merely tired.

[3] Respondent was originally also charged in a companion case, CF-2021-98, with a felony, Assault and Battery by Means or Force as is Likely to Cause Death, based on Foltz's injuries. That charge was dismissed on November 15, 2021, and the records were sealed.

[4] In State v. Cheek Respondent was ordered to appear or face sanctions. In McElroy v. Tomlinson Respondent was removed from the case and ordered to immediately return all unused retainer fees. In State v. Fullerton Respondent was removed as counsel. In State v. McCaleb Respondent was ordered to return all unused retainer fees. In State v. Thompson Respondent was removed, reinstated, and removed from the case again.

[5] Respondent admitted that officers confiscated his firearms after the protective order issued. When asked whether he obtained another firearm after that, he invoked the Fifth Amendment.

[6] Section 305.1 provides that a potential defendant and district attorney may agree to defer a criminal filing before any charges are brought. 22 O.S. 305.1. This statute would not appear to apply where the potential defendant has already entered a no contest plea to a charge and received a deferred sentence. Craig Ladd, the District Attorney for District 20, testified at the PRT hearing that he did not believe this modification, or the modifications under Section 982a, were legally permissible. Ladd testified that he had been unaware of the deferred sentence modifications, was embarrassed to learn of them, and had admonished the assistant district attorney who agreed to them. However, Ladd said, he believed Respondent's sentence modifications must stand because the statutes do not provide a way to undo the trial court's order.

[7] This is in keeping with his argument to the PRT regarding discipline. In his July 2022 Brief before that tribunal, he argued that his modified deferred sentences would soon expire, that he planned to seek to have all the deferments expunged, and that the victim protection order which was the basis for CM-2020-192 was dismissed in April of 2022. He inaccurately argued to the PRT that he had not been charged with a felony and that his misdemeanor offenses were not serious and suggested that a six-month suspension with probation would be an appropriate punishment.

[8] Evidence of this consultation was explicitly admitted to show Respondent was continuing treatment, not to show he had received any medical diagnosis from the psychiatrist.

[9] The sign-in sheets show regular meeting attendance from January 2022 through early June 2022, during which time other evidence was that Respondent was not using methamphetamine; in April, part of May, and December 2021; and attendance in August, September, October, November, and a week in December 2020. Several of the attendance logs submitted are duplicates. Most sheets are headed NA/AA Attendance Log, NA/AA Sign-up Sheet, or AA/NA Record; one has no heading.

[10] Some of these tests were done in anticipation of a paternity and custody suit Respondent was involved in, and some were done in anticipation of the PRT hearing.

[11] As the Presiding Master of the Tribunal pointed out and Respondent admitted, even if Respondent could show bias on the part of the arresting officers, Respondent had already pled guilty to the crimes charged as a result of those arrests, so that showing would not mitigate the Rule 7 allegations.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1990 OK 9, 791 P.2d 815, 
State ex rel. Oklahoma Bar Ass'n v. Armstrong
Discussed

 
2002 OK 15, 55 P.3d 1017, 73 OBJ 890, 
REDCORN v. STATE FARM FIRE & CAS. CO.
Cited

 
2003 OK 61, 72 P.3d 27, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GIGER
Discussed at Length

 
2005 OK 91, 127 P.3d 600, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GARRETT
Discussed

 
2008 OK 62, 195 P.3d 31, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SHANBOUR
Discussed

 
2012 OK 29, 275 P.3d 133, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CONRADY
Discussed at Length

 
2014 OK 20, 323 P.3d 222, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BERNHARDT
Discussed

 
2014 OK 96, 339 P.3d 895, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HART
Discussed

 
2016 OK 109, 384 P.3d 1129, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN
Discussed

 
2020 OK 93, 477 P.3d 376, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. PISTONIK
Discussed at Length

 
2021 OK 28, 488 P.3d 734, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. NICHOLS
Discussed

 
2021 OK 61, 500 P.3d 619, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MCBRIDE
Discussed at Length

 
2022 OK 15, 501 P.3d 1141, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILLIS
Discussed

 
2022 OK 16, 504 P.3d 1153, 
BOOTH v. HOME DEPOT
Cited

 
2022 OK 68, 522 P.3d 464, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SILVERNAIL
Discussed at Length

 
2023 OK 53, 529 P.3d 185, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LITTLEFIELD
Discussed

Title 5. Attorneys and the State Bar

 
Cite
Name
Level

 
5 O.S. 1, 
Persons Who May Not Practice as an Attorney - Aliens
Discussed at Length

Title 22. Criminal Procedure

 
Cite
Name
Level

 
22 O.S. 305.1, 
Deferred Prosecution Programs - Guidelines - Factors Considered
Cited

 
22 O.S. 982a, 
Modification of Sentence - Time Limitation - Applicability - Report - Notice and Hearing - Appeal
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA